2005 SD 76

**BON HOMME COUNTY COMMISSION,**
Appellant,

v.

**AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES (AFSCME), LOCAL 1743A, Appellee.**

**Kingsbury County Commission,**
Appellant,

v.

**American Federation of State, County, and Municipal Employees (AFSCME), Council 59, Local 169, Appellee.**

**Nos. 22720, 22721.**

Supreme Court of South Dakota.

Argued April 27, 2004.

Decided June 15, 2005.

---

Mark A. Fahleson of Rembolt, Ludtke & Berger, LLP, Lincoln, Nebraska, Attorneys for appellants.

Lisa Z. Rothschadl, Bon Homme County State's Attorney, Tyndall, South Dakota, Attorney for appellant Bon Homme County Comm.

Gary W. Schumacher, Deputy Kingsbury County State's Attorney, DeSmet, South Dakota, Attorney for appellant Kingsbury County Comm.

Linda Lea M. Viken, Rapid City, South Dakota, Attorney for appellee.

KONENKAMP, Justice.

[¶ 1.] These are appeals in two separate unfair labor practice cases primarily regarding public employer insistence on a "management rights clause" in their negotiated agreements. In both cases, the Department of Labor and the circuit court ruled that the employers had engaged in unfair labor practices. We affirm in part and reverse in part.

### Bon Homme County v. AFSCME Local 1743A

[¶ 2.] The American Federation of State, County, and Municipal Employees (AFSCME) Local 1743A is the duly recognized union bargaining representative for the highway employees of Bon Homme County. In 1995, Bon Homme County and the union successfully negotiated a collective bargaining agreement. The agreement was effective from December 1994 until November 1996. In the summer of 1996, representatives on each side met to negotiate on a successor agreement. During the second negotiation session, the county informed the union that it intended on negotiating for a "management rights" clause. The parties reached impasse in negotiations, and, in December 1996, the county made its last, best, and final offer. When no agreement was reached, the county implemented its last offer.

[¶ 3.] In April 1998, the union requested that negotiation begin for the 1999 contract year. It was not long until the county's "management rights" language began to stall discussions. After fruitless negotiations, the county proposed its final offer. That offer included a $.22 per hour wage increase and the management rights clause.

[¶ 4.] On December 31, 1998, the union informed the county that its membership rejected the last, best, and final offer. The county refused to implement its offer unless the union agreed to the management rights language. The following management rights provisions were part of the county's final offer:

A. Except to the extent expressly limited by the specific language of this agreement, the county shall retain the right to manage the facility and its business including, the right to determine days worked, hours worked, shifts worked, and hours of shifts; the length of the work day and work week and if and when overtime shall be worked; to determine the starting and quitting time and the number of hours and shifts to be worked; to hire, promote, demote, layoff, discharge, suspend and transfer employees; to reduce hours in lieu of layoff; to determine the knowledge, skill, qualifications and other abilities of employees; to evaluate employees; to establish acceptable performance levels by employees and to modify those levels; to modify the date of method of paycheck distribution; to establish a new department; discontinue existing departments; to develop and modify all manner of work and safety rules and to establish disciplinary actions for violations of those rules; to develop and modify drug and alcohol and smoking policies; to determine the number of employees in each of the county's job classifications; and otherwise to generally manage the operation and to direct the work force.

B. The county shall also have the sole right to introduce new or improved methods or equipment, to determine types of machinery to be used, hours of work, quality of workmanship required, time standards to apply, and to develop and modify incentive pay plans.

C. The county may reorganize or discontinue the county services in whole or in part, sell or dispose of any part or all of its assets; move any or all of the county services and determine the number and location of its operations and the services and product handled. The county may subcontract or transfer work or operations as deemed necessary by management. It also reserves the right to assign supervisory and management personnel to perform bargaining unit work and to employ part-time employees as it determines is necessary.

D. The above rights are not conclusive, and it is understood that any of the rights, powers, or authority the county had prior to the signing of this agreement are retained by the county except those specifically united or modified by the agreement.

[¶ 5.] It is undisputed that AFSCME had agreed to similarly broad management rights language in other collective bargaining agreements. In fact, the union also had tentatively agreed to this language in earlier negotiations. But as negotiations proceeded, the union proposed deleting all of this management rights language. The county took the position that this was a subject that had been removed from the bargaining table in earlier negotiations. At its January 5, 1999 meeting, the county commission approved the salaries of its employees for 1999 and voted to fully implement its proposed management rights clause. However, union members did not receive the $.22 per hour raise given to other county employees.[1]

---

1. Bon Homme County did not grant a raise for the employees until October 9, 2000. At that time, the employees were given a $.47 per hour wage increase. The identical amount previously received by non-union employees.

[¶ 6.] The union filed unfair labor practice charges against the county on March 29, 1999. A Department of Labor hearing was held on January 25–26, 2001. On February 21, 2002, the ALJ, Randy S. Bingner, issued his written decision. On appeal, the circuit court affirmed in part and reversed in part. Bon Homme County now appeals to this Court.[2]

### Kingsbury County v. AFSCME Council 59 & AFSCME Local 169

[¶ 7.] AFSCME Council 59 is the state organization of the American Federation of State, County, and Municipal Employees Union, a division of the AFL–CIO. AFSCME Local 169, an affiliate of AFSCME Council 59, is the bargaining representative for the highway employees of Kingsbury County. In 1997, county and union representatives negotiated and entered into a collective bargaining agreement. The agreement was effective from January 1998 through December 1999. In March 1998, as allowed for in the agreement, the union notified the county that it desired to reopen negotiations on wages and other issues. The first session began in June 1998. From the outset, the negotiations were contentious.

[¶ 8.] The next session occurred the following month. Before the second session, the county notified the union that it intended to have a management rights clause in the agreement. Throughout the subsequent negotiations, the union raised general concerns over the proposed language and sought to address separately specific concerns. The county refused to move away from its proposal and the parties were soon at impasse. As a result of conciliation, the parties agreed to maintain the status quo for the duration of the agreement.

[¶ 9.] In June 1999, the parties began negotiating for a new contract. The county continued to insist on its management rights clause. After several letters and one last negotiation session, the parties declared an impasse. Conciliation with the Department of Labor failed to result in an agreement, and on December 23, 1999, the union filed a petition alleging an unfair labor practice. On January 7, 2000, the county notified the union that it intended to implement its last offer. The offer included the following management rights provisions:

*Section 1.* Except as specifically limited by this Agreement's provisions, the County retains the sole and exclusive right to exercise all management rights or functions.

*Section 2.* Without limiting the generality of the foregoing, the County has the right to control the use of all County property and its operating units and di-

---

**2.** Bon Homme County presents the following appeal issues: (1) "The circuit court and department erred in finding the union's claim of unfair labor practices was not time barred." (2) "The circuit court erred in affirming the ... department's decision that the county's bargaining to impasse on the issue of management rights was unlawful." (3) "The circuit court erred in retroactively applying their new rule." (4) "The circuit court erred in creating a new rule that a non-school district public employer must implement all terms and conditions contained within its final offer upon reaching impasse." (5) "The circuit court erred in reversing the department to hold that the county violated [SDCL] 3–18–3.1(1) & (3) by not allowing the union to block a planned pay increase for non-bargaining unit members." (6) "The department and circuit court erred in finding that the union did not commit an unfair labor practice by refusing to negotiate in good faith over the issue of management rights." (7) "The circuit court erred in affirming the department's finding that the county violated SDCL 3–18–3.1(5) by informing the union that a retroactive wage increase was not guaranteed." (8) "The court and department exceeded their statutory [sic] and impermissibly delegated their authority to the union."

rect the work of the employees, including, but not limited to, the right to discharge, suspend, or otherwise discipline employees for just cause; to demote, transfer or promote employees; to establish, assign and change work shifts; to allocate and assign work to employees; to determine the amount of work needed and to lay employees off.

*Section 3.* The County also has the right to do the following: establish and change operating processes, workplace layouts, techniques, methods, equipment, or facilities used; the materials to be used; set standards and judge the quality and quantity of work, as well as other work performance factors; maintain quality and efficiency of operations; determine financial policies, including accounting procedures, cost of processing and/or providing services; and determine public relations policies.

*Section 4.* The County shall also retain the right to establish work schedules for employees, including the determination of starting times and the number of hours to be worked in any day, week or shift; to determine or change the number of employees necessary to operate any operating unit of the County; to determine the management organization for each County unit; to select who shall be hired and not hired; to utilize part-time and temporary employees; to determine the knowledge, skill, qualifications and other abilities of employees or applicants for employment; to evaluate the performance and skills of employees; to develop and implement job specific tests and evaluation to determine employee skills, abilities, and performance; to establish, revise and modify employee work rules; to decide where or when training on a particular operation or job is required, how much training is required, and the right to move, retrain and transfer employees; to establish or modify job duties and classifications, including the skills required for each job; and to use complete discretion in the employment of the services of all supervisors, including the rights to assign supervisory personnel to perform bargaining unit work.

*Section 6.* The County has the right to subcontract or contract out work, or enter into work sharing arrangement with other counties.

\* \* \*

*Section 9.* In the event of any ambiguity between this Article and another Article of this Agreement, the terms of this Article shall control.

\* \* \*

[¶ 10.] A Department of Labor hearing was held on December 5–6, 2000. After the hearing the ALJ, Heather E. Covey, entered a written decision on December 28, 2001. The circuit court affirmed in part and reversed in part. Kingsbury County now appeals.[3]

---

3. Kingsbury County advances the following appeal issues: (1) "The circuit court erred in affirming the department's decision that it is *per se* unlawful for a public employer to bargain to impasse on the issue of management rights." (2) "The circuit court and department erred in retroactively applying their new rule." (3) "The circuit court erred in reversing the department's decision and concluding that offers made in mediation are admissible." (4) "The circuit court erred in creating a new rule that a non-school district public employer must implement all terms and conditions contained within its final offer upon reaching impasse." (5) "The circuit court erred in reversing the department to hold that the county violated [SDCL] 3–18–3.1(3) by allowing the union to block a planned pay increase for non-bargaining unit members." (6) "The department and circuit court erred in finding that the union negotiated in good faith." (7) "The court and department ex-

## Analysis and Decision

[¶ 11.] Our review is guided by SDCL 1–26–36: we "give great weight to the findings made and inferences drawn by an agency on questions of fact." *Id.* (1983). Only when an agency's findings are clearly erroneous will we reverse. *Id.* An agency's conclusions of law are reviewed de novo. *Kurtz v. SCI*, 1998 SD 37, ¶ 10, 576 N.W.2d 878, 882. Statutory interpretation is a question of law reviewed de novo. *Lakota Community Homes, Inc. v. Randall*, 2004 SD 16, ¶ 9, 675 N.W.2d 437, 440 (citation omitted).

### 1. Management Rights Clause

[¶ 12.] The question presented is whether the public employers here engaged in good faith bargaining when they negotiated for their management rights clauses to the point of impasse. In the Kingsbury County case, the ALJ ruled that the "unilateral imposition of the management rights clause forces upon [the union] language giving up its right to negotiate wages, hours, and other terms and conditions employment" guaranteed by South Dakota law. The ALJ concluded that the county "never demonstrated a legitimate business need for the proposed management rights clause." In the Bon Homme County case, the ALJ held that the county was not guilty of an unfair labor practice by proposing and negotiating for management rights language in its agreement: to propose such a clause was not by itself unlawful. Nonetheless, the ALJ ruled that Bon Homme County's continued insistence on its management rights language and its refusal to negotiate that language became an unfair labor practice.

[¶ 13.] Under the laws of South Dakota, public employees enjoy the right to collectively bargain with their employers. SDCL ch 3–18 *et seq.; Council of Higher Educ. v. South Dakota Bd. of Regents*, 2002 SD 55, ¶ 7, 645 N.W.2d 240, 242. As part of this bargaining process, public employers are required to " 'negotiate matters of pay, wages, hours of employment, or other conditions of employment.' " *Council of Higher Educ.*, 2002 SD 55, ¶ 7, 645 N.W.2d at 242 (quoting *Sisseton Educ. Ass'n v. Sisseton Sch. Dist. No. 54–8*, 516 N.W.2d 301, 303 (S.D.1994) (citation omitted)). Employers and employees are required to "negotiate collectively in good faith. . . ." SDCL 3–18–3.2(4) (1993); *see also* SDCL 3–18–2 (1980). Although we have no explicit definition of the term "negotiate collectively in good faith," we interpret this requirement to mean that the parties must seriously work to resolve differences and reach a common understanding.

[¶ 14.] If negotiations are not successful, SDCL 3–18–8.1 permits either party to request Department of Labor conciliation. *Id.* (1983). When these efforts do not result in an agreement, a request may be made by either party that the department investigate the situation and publicly report its recommendations. *Id.* If an agreement still remains unattainable, South Dakota law provides that a public employer may unilaterally implement the disputed provisions if the parties have bargained in good faith and a legitimate impasse exists. *Sisseton Educ. Ass'n*, 516 N.W.2d at 303. The effect of this procedure is that " 'while under a duty to negotiate in good faith, [a public employer is] not required to agree to a contract or any specific rates of pay, wages, hours of employment or other conditions of employment.' " *Id.* (following *South Dakota Bd.*

ceeded their statutory authority in the reme-    dies awarded."

*of Regents v. Heege;* 428 N.W.2d 535, 541 (S.D.1988)).

[¶ 15.] The unions believe that we must apply a "stricter good faith standard" for deciding whether a public employer has bargained in good faith. Such a heightened standard is warranted, they argue, because public employees in South Dakota are not vested with the right to strike. Public employees, through legislative policy, have been granted certain rights: SDCL ch 3–18. Other rights have been restricted: public employees are prohibited from striking. SDCL 3–18–10 (1969); *AFSCME Local 1922 v. State,* 444 N.W.2d 10, 14 (S.D.1989). We believe that the statutory guidelines set forth by our Legislature provide sufficient ground rules that warrant no judicial refinement. In short, SDCL 3–18–2 and 3–18–3.1 both provide that public employers must negotiate in good faith—nothing more, nothing less. The Legislature obviously thought that this good faith requirement in negotiations provided adequate protection to public sector employees.

[¶ 16.] We think it wholly beyond our function to rule, as the unions insist we must, that in "interpreting the rights and responsibilities under South Dakota's public employee bargaining statutes, consideration must be given to the difference between the rights of public employees versus those of private employees." Our Legislature must address whatever policy concerns may arise from the denial of the right to strike. Unless constitutional rights and privileges are implicated, we leave such questions to our elected representatives.

[¶ 17.] In the Kingsbury County case, the ALJ reasoned that because "[n]either party argued which specific phrases or clauses of the management rights language are proper or improper . . . [t]he Department's ruling will take the language into consideration as a whole and not phrase by phrase or clause by clause." The ALJ then concluded, and the circuit court later agreed, that the county could not impose its management rights clause because it required the union to "forfeit its rights as guaranteed by law." This Court rejected such overarching declarations in *Rapid City Educ. Ass'n v. Rapid City Area Sch. Dist. No. 51–4:*

> The role of the courts in a scope of negotiations case is to determine, in light of the competing interests of the [public employer] and its employees, whether an issue is appropriately decided by the political process or by collective negotiations. In making this sensitive determination, *the mere invocation of abstract categories like "terms and conditions of employment" and "managerial prerogatives" is not helpful.* To determine whether a subject is negotiable, "the Court must balance the competing interests by considering the extent to which collective negotiations will impair the determination of governmental policy."

376 N.W.2d 562, 564 (S.D.1985) (quoting *In re Local 195, IFPTE, AFL–CIO v. State,* 88 N.J. 393, 443 A.2d 187, 191 (1982)) (emphasis added). We can understand the ALJ's difficulty, however. Abrasive language and needless posturing exhibited during negotiations, the details of which we decline to recount here, demonstrate that, at times, each side took an intransigent position. We are not here to facilitate such gamesmanship. Just as the "mere invocation" of abstract terms and categories is *not* helpful in determining whether a subject is negotiable, neither is it appropriate for a reviewing authority to declare, as a matter of policy, that management rights clauses are *per se* proper or improper. Such an analysis may be expedient, but it assists little in determin-

ing whether individual portions of a clause may be the proper subject of negotiation or may in some way unlawfully obstruct public employee rights to negotiate. Thus, all we need declare today is that it is not unlawful for a public employer to negotiate to impasse over a management rights clause.

[¶ 18.] Our precedent and the precedent from other jurisdictions support this conclusion. In *Sisseton Educ. Ass'n*, the teachers' association objected to a provision that reserved for the school board "the right to go over and above (salary) schedule when [the board] deem[ed] it necessary." 516 N.W.2d at 302. Arguing that the provision gave the school board "unfettered discretion to adjust teacher salaries whenever and for whatever reason the Board desire[d]," the association declared that the provision's effect would be to nullify the teachers' statutory right to bargain. *Id.* at 303. In response, this Court wrote:

> The contract provision does not give the Board unfettered discretion. The provision only allows the Board to go above the salary schedule when it deems it is necessary. In carrying out its responsibility of insuring a fully staffed and qualified teaching faculty, the Board is bound to an objective standard of necessity when implementing this provision. If the Board applies the provision subjectively or for the specific purpose of obviating the salary schedule, it would be subject to grievance or unfair labor practice proceedings.

*Id.* at 303–04. This Court went on to specifically hold that "the Board bargained in good faith to a bona fide impasse and was entitled ... to implement its last offer." *Id.* at 304. True, the provision in dispute was not couched in terms of managerial rights or prerogatives. However, the provision was similar in some respects to provisions in dispute here.

[¶ 19.] Under federal law, employers can bargain for "managerial rights." In *National Labor Relations Bd. v. American Nat. Ins. Co.*, 343 U.S. 395, 409, 72 S.Ct. 824, 832, 96 L.Ed. 1027 (1952), the Supreme Court rejected an argument that an employer's bargaining for a managerial rights clause was an unfair labor practice. In so holding, the Court discounted fears that allowing bargaining for such clauses would "lead to evasion of an employer's duty to bargain collectively...." *Id.* The Court ruled that "[t]he duty to bargain collectively is to be enforced by application of the good faith bargaining standards ... to the facts of each case rather than by prohibiting all employers in every industry from bargaining for management functions clauses altogether." *Id.* Here, we are not dealing with a private enterprise, but with government. Although it has a duty under South Dakota law to bargain in good faith, a government entity surely has the authority to bargain for certain management rights.

[¶ 20.] Acknowledging the United States Supreme Court's holdings in this area, the *Washington Supreme Court in Pasco Police Officers' Ass'n v. City of Pasco*, 132 Wash.2d 450, 938 P.2d 827, 836 (1997), held that it was not improper for a public employer to bargain to impasse on a management rights clause. Defusing an argument that federal precedent was inapplicable to Washington law because federal law rests on the right of private employees to strike, the court noted that "while the Association is correct that uniformed employees do not have the right to strike, it ignores the requirement that public employers are obligated to negotiate in good faith. This obligation insures that management rights proposals do not overreach and are enforceable under the statute."

*Id.* (internal citation omitted). This holding tends to negate the suggestion of the unions here that the Washington Supreme Court's reasoning was somehow based purely on the fact that upon impasse Washington law mandates that the parties submit to binding arbitration.

[¶ 21.] The unions point to a Florida appellate court opinion to support their argument. In *Palm Beach Junior College Bd. of Trustees v. United Faculty of Palm Beach Junior Coll.*, 425 So.2d 133 (Fla. Dist.Ct.App.1982), the court accepted an argument against a management rights clause in a public contract, in part because a "major distinction between public sector law and that in the private sector is that in the latter the employee has the option to strike...." *Id.* at 139. However, that decision was appealed to the Florida Supreme Court. *Palm Beach Junior Coll. Bd. of Trustees v. United Faculty of Palm Beach Junior Coll.*, 475 So.2d 1221 (Fla. 1985). While the Florida Supreme Court agreed that the clause presented should neither have been taken to impasse nor mandated, it was not, as the unions suggest, due to a policy declaration that because public employees lacked the right to strike, federal case law was inapplicable. Rather, the court declared, "What the College bargaining agent demanded in this case bears no resemblance to the management rights clause in *American National.* The College was not seeking recognition of management rights, provided for in [Florida statutory law], but a waiver of rights under [Florida law]." [4] *Id.* at 1225.

[¶ 22.] Consequently, although it is not *per se* unlawful for a public employer to bargain to impasse over a management rights clause, an employer may not use these clauses in such a way as to constitute an unfair labor practice. Where a public employer fails "to negotiate collectively in *good faith*," that employer commits an unfair labor practice. SDCL 3–18–3.1(5) (1973) (emphasis added). SDCL 3–18–2 provides in part:

> The negotiations by the governmental agency or its designated representatives and the employee organization or its designated representative shall be conducted in good faith. Such obligation does not compel either party to agree to a proposal or require the making of a concession but *shall require a statement*

---

4. The clause the Florida appeals court found so repugnant provided:

> Whenever the Employer exercises a right to [or] privilege contractually reserved to it or retained by it, the Employer shall not be obliged to bargain collectively with respect to the effect or impact of that exercise on individual unit members or on the unit as a group, or to postpone or delay effectuation or implementation of the management decision involved for any reason other than an express limitation contained in this Agreement.

*Palm Beach Junior Coll. Bd. of Trustees*, 425 So.2d at 135. Conversely, the Florida Supreme Court did not condemn the language found in *American National supra,* because the language was "strikingly similar" to management rights delineated by Florida. law. *Palm Beach Junior Coll. Bd. of Trustees*, 475 So.2d at 1225 n. 5. That clause provided:

> The right to select and hire, to promote to a better position, to discharge, demote or discipline for cause, and to maintain discipline and efficiency of employees and to determine the schedules of work is recognized by both union and company as the proper responsibility and prerogative of management to be held and exercised by the company, and while it is agreed that an employee feeling himself to have been aggrieved by any decision of the company in respect to such matter, or the union in his behalf, shall have the right to have such decision reviewed by top management officials of the company under the grievance machinery hereinafter set forth, it is further agreed that the final decision of the company made by such top management officials shall not be further reviewable by arbitration.

*Id.* (further citation omitted).

*of rationale for any position taken* by either party in negotiations.

*Id.* (emphasis added). Good faith negotiation requires that where a party refuses to agree to a proposal or make a concession, that party is required to provide a "statement of rationale." We do not interpret this requirement as permitting any reason to suffice. To do so would render the language meaningless, and our method of statutory interpretation requires that we find a meaningful understanding of a statute where possible. *See Rapid City Educ. Ass'n*, 522 N.W.2d at 498. Here, the statute sets forth a requirement that parties to negotiations who neither agree nor concede to a proposal must present a legitimate and specific rationale for their positions.

[¶ 23.] Both Bon Homme and Kingsbury Counties failed in their obligations on this point. In each case, the ALJs found that the counties lacked a good faith rationale for insisting on the inclusion of the disputed provisions. The rationale provided by Kingsbury County in its brief appears to have little relationship to the rights it desired to have memorialized in its agreement. As to Bon Homme County, the ALJ found that "[t]he only rationale provided by county to support its need for a management rights clause was its need for 'flexibility' in decision making." The ALJ in the Kingsbury County case also determined that the county's "rationale for its management rights clause is not believable."

[¶ 24.] Among the reasons listed by Kingsbury County in its brief are:

(1) The County roads department had been in "disarray ... [a]s far as in the working accomplished, the management, the attitude of the employees with the highway superintendent. There was very little control over the employees by the management of the Highway Department;"

(2) At the time negotiations commenced, the County "had a relatively new department head and that department head [wanted] greater latitude in managing the operation;"

(3) The County desired to have the ability to work cooperatively with other governmental units and contractors to save taxpayer dollars;

(4) "[C]ounties have to operate more and more like private industry and ... restrictive contract language wouldn't help us reach our goal;"

(5) The County merely wanted language similar to that which the Union had agreed to in other bargaining units throughout South Dakota; and

(6) "The County needs to know what their rights were."

These reasons are not specific. Bon Homme County's reasons are equally nebulous, listing the following explanations for its desire to incorporate the clause:

(1) The County wanted the same flexibility that Pennington County had with its contract with this same Union;

(2) The County desired the ability to make decisions quickly and efficiently;

(3) The County desired more flexibility over such things as subcontracting gravel hauling and the buying and disposing of equipment; and

(4) The County wanted its rights expressly spelled out in the contract.

These statements lack any legitimate or precise rationale for the provisions desired.

[¶ 25.] Our laws prevent a "union from having a unilateral veto over the terms that the employer desires, from thwarting governmental objectives, and

from disturbing the efficiency of governmental operation." *Council of Higher Education*, 2002 SD 55, ¶ 7, 645 N.W.2d at 243. Given that these counties possess ample legal protection from disruption of governmental efficiency, we cannot view their bald assertions that the need for more flexibility justifies imposing these expansive clauses. Thus, while good faith negotiations may still occur where a party refuses to agree or concede, those negotiations require a meaningful statement of rationale for each position taken. As the proponents of their management rights clauses, the counties had the duty to specifically explain a rationale for each provision. Then the unions would be required to specifically respond. Here, the counties never fulfilled their initial obligation. Therefore, they failed to negotiate in good faith as required by law. Although we decline to render any broad ruling declaring these management rights clauses lawful or unlawful, we agree with the narrower holding of the department and the circuit court that the counties failed to provide an adequate rationale for their provisions. Accordingly, we affirm the ultimate conclusion that the counties committed an unfair labor practice.

### 2. Requirement to Implement Last Offer

[¶ 26.] In the Kingsbury County case, the ALJ did not specifically rule on the question whether the county was required to implement its last best offer. In the Bon Homme County case, the ALJ ruled that, except in "education cases," it did not

have authority to order a public employer to implement its last best offer. Nonetheless, the circuit court ruled in both cases that "the public employer is to implement its last best offer and the offer is not to vary from what was proposed, except to the extent any such offer is illegal." The court reasoned that "[b]ecause public employees in South Dakota have no right to strike, allowing a public employer to pick and choose which portions of its last best offer it will implement would allow the employer to coerce the employee organization to agree to terms, such as the management rights clause proposed herein, in order to guarantee pay raises or other benefits to its members. . . . If the implementation of the last best offer is not required then there is no meaning to negotiations in good faith."

[¶ 27.] The counties argue that the circuit court erred in creating a new rule that a non-school district public employer must implement all terms and conditions in its last offer. But the unions point to our holding in *Council of Higher Educ. v. South Dakota Bd. of Regents* as authority to support the circuit court's decision. At issue in *Council of Higher Educ.* was whether a public employer could unilaterally impose a liquidated damages clause where the employees did not agree because to do so violated SDCL 53–9–4 and 53–9–5. 2002 SD 55, ¶ 8, 645 N.W.2d at 243. Thus, the applicability of SDCL 3–18–8.2 was not squarely addressed in that case.[5] The Court simply

---

5. SDCL 3–18–8.2 provides:

Any school district issuing contracts to teachers for the ensuing year, but prior to reaching agreement with the representatives of the recognized employee unit, shall issue the contracts under the same terms and conditions as for the current year. If no agreement is reached in negotiations and the intervention of the labor depart-

ment under § 3–18–8.1 fails to bring about an agreement, the board shall implement, as a minimum, the provisions of its last offer, including tentative agreements. If the labor department is not requested to intervene under the provisions of § 3–18–8.1, the board shall implement the provisions of its last offer, including tentative

applied the statute to the Board of Regents without discussion or elaboration about why the statute was applicable. *Id.* ¶¶ 11–12. Despite the decision in *Council of Higher Educ.*, we cannot ignore the distinct language of the statute. It creates an exception to the general rule only for school districts. *Heege,* 428 N.W.2d at 541 n. 2. The unions make an impassioned argument that without this requirement, explicitly applicable only to school districts and teachers, a ruling against the counties that they engaged in an unfair labor practice would be a hollow victory because the only remedy would be to require the counties to return to the bargaining table. These are compelling points, but our duty limits us to interpreting statutes, not amending them. It remains for the Legislature to put more teeth in its remedies for unfair labor practices if it so desires. Consequently, the counties were not required to implement their entire last best offers. The circuit court erred in concluding otherwise.

### 3. Discouraging Union Membership

■ [¶ 28.] In the Bon Homme County case, the ALJ found an unfair labor practice when, despite the fact that there was no genuine impasse on the wage issue, the county "refused to implement the wage increase offered to the union for no other reason than the fact that the union had not agreed to the complete contract." The ALJ concluded that this was done to discourage union membership. On the other hand, in the Kingsbury County case, the ALJ ruled that the union had failed to establish an unfair labor practice to discourage union membership. According to the union, however, the county had withheld pay raises from the employees during the course of bargaining, had refused to

grant retroactive pay raises when an agreement was reached on wages, and had withheld a pay raise for union members that it had authorized for all employees, while giving it to non-union county employees.

[¶ 29.] The circuit court concluded that both counties, by granting pay increases to non-union employees while denying the same increases to union employees, had violated SDCL 3–18–3.1(3). This statute defines an unfair practice to include discrimination in regard to "any term or condition of employment to encourage or discourage membership in any employee organization[.]". SDCL 3–18–3.1(3). Under this statute, an employer's actions must have the intent or purpose of encouraging or discouraging membership in an employee organization. It is not sufficient that a term or condition of employment merely affects membership in an employee organization.

[¶ 30.] Considering all the circumstances, our review of the record clearly demonstrates that both counties' actions resulted in discouraging union membership. Thus, the only question remaining is whether the counties intended such a result. In *Nat'l Labor Relations Bd. v. Erie Resistor Corp.,* the Supreme Court explained that "specific evidence of ... subjective intent is 'not an indispensable element of proof of violation.'" 373 U.S. 221, 227, 83 S.Ct. 1139, 1144, 10 L.Ed.2d 308 (1963) (citation omitted). In reaching this conclusion, the Court reasoned that an "employer in such cases must be held to intend the very consequences which foreseeably and inescapably flow from his actions and if he fails to explain away, to justify or to characterize his actions as something different than they appear on

agreements, eleven days after an impasse is declared.

*Id.*

their face, an unfair labor practice charge is made out." *Id.* at 228, 83 S.Ct. at 1145 (citation omitted). Here, the destructive impact of the counties' actions cannot be doubted. Both counties, using the same negotiator who employed the same tactics, withheld raises for union members and granted them to non-union members when the unions would not agree to the whole of the counties' management rights language. Accordingly, the circuit court did not err in determining that the counties' actions amounted to an unfair labor practice.

### 4. Remedies

[¶ 31.] In Issue 2, we dealt with the question whether the counties were required to implement their last best offers. We concluded that the circuit court erred in ordering them to implement those offers. In this section, we address whether the counties were required to compensate union members for the back pay they would have received had they been able to reach a contract with the counties, when the failure to reach agreement was a result of the counties' unfair labor practices. Each county's circumstances must be addressed separately.

### (a) Kingsbury County

[¶ 32.] On January 10, 2000, the county granted pay raises to non-union employees of 30¢ an hour and to union employees of 20¢ per hour. When the county notified the union on January 7, 2000, that it intended to implement its last offer, the offer that included its management rights clause, the county took the position that its last offer on a pay raise was for a raise of 20¢ per hour. The union argued that the last best offer was the one made during conciliation for 30¢ an hour. The ALJ in the Kingsbury County case did not order the county to implement any last best offer; nor did she order the county to compensate union members for the difference of 10¢ per hour loss union members suffered in comparison to non-union county employees. As the ALJ explained in her findings of fact,

#### W.

County gave a 30¢ an hour raise to the Courthouse employees and had authorized [the county's negotiator] to offer a 30¢ an hour raise to the Union members.

#### X.

[The county's negotiator] did not offer the 30¢ an hour increase until conciliation, and the 30¢ was never implemented.

#### Y.

Union has failed to demonstrate why the highway department employees and the county courthouse need to be treated the same. Union has also failed to establish a past practice of granting retroactive pay raises.

In reversing the ALJ's decision, the circuit court stated in its findings of fact:

#### 6.

The non-Union employees were given 10¢ an hour raise over the wage increase given to Union members. No rationale or explanation for that difference was given by the County. In fact, the testimony was that the County had sufficient money in its budget to pay the higher amount to the Union members and the only reason the County did not do so was because there was not an agreement with the Union.

#### 7.

While [the county's negotiator] had authority to give a 30¢ an hour raise to the Union members, similar to that given to

other non-Union employees of the County, he offered only 20¢ until conciliation unless the Union agreed to the management rights clause.

### 8.

At conciliation the County proposed a 30¢ an hour increase to the Union members, the same as it gave to other county employees.

### 9.

The County Commission granted wage increases to non-Union employees and denied an increase to Union members, even though the amounts were budgeted, because the Union would not agree to a management rights clause.

In its conclusions of law, the court decided,

### 13.

[T]he 30¢ an hour offer in conciliation is part of the employer's last best offer.

### 14.

The employees represented by AFSCME are entitled to the 10¢ an hour pay raise commensurate with County's last best offer and are entitled to prejudgment interest thereon from and after the date the non-Union employees received there 30¢ an hour increase.

From an overall view of the court's findings, it is clear that the circuit court viewed the 10¢ an hour difference as intrinsic to its ruling that the county was required to implement its last best offer. The unfair labor practice complaint

---

6. The union argued in its appellate brief to the circuit court that the requirement to implement the last best offer was the reason for the ALJ's finding of an unfair labor practice: "The Department of Labor did not hold that the County offered a wage increase to non-unit employees as some sort of 'reward' for

brought by the union, dated February 11, 2000, specifically requested as a remedy that the department determine that the county "may not impose less than the offer made in mediation and the last written offer[.]" Indeed, the appellate brief submitted by the union argues that the circuit court's order to pay the additional 10¢ per hour as back pay "would naturally flow from . . . the decision that the county was required to implement no less than its last best offer of 30¢ an hour. . . ." As we previously indicated, however, only school districts are required to implement their last best offers. Therefore, the court erred in concluding that the county was required to pay union members an additional 10¢ per hour with interest in accord with the county's last best offer. On the other hand, the court overturned the ALJ's decision that Kingsbury County had not committed an unfair labor practice by acting to discourage union membership in refusing to give raises to bargaining unit members but giving raises to non-unit members, in violation of SDCL 3–18–3.1(3). Today, we uphold that ruling. Accordingly, we must decide if that violation permitted the circuit court to order the back pay. *See infra* part (c).

### (b) Bon Homme County

[¶ 33.] Like the circuit court's decision in the Kingsbury County case, its decision in the Bon Homme County case to award back pay was based, at least in part, on the refusal of the county to pay a wage increase contained in its last best offer to unit member employees.[6] Relying on

---

being non-union. Nor did it hold that the County's wage increase to non-unit members was an unfair labor practice. It was the refusal of the County to pay a wage increase contained in their last best offer to the employees which resulted in the unfair labor practice finding on this issue." On the con-

school district law, the court reasoned that "[a] public employer is required to implement its last best offer." As part of negotiations in 1998, the county offered union members a 22¢ an hour wage increase, the same amount proposed for non-bargaining unit employees. The union members voted to reject the offer because the county's proposed management rights clause was part of the package. The county implemented that raise for non-bargaining unit members in 1999. Nonetheless, despite the fact that the parties remained at impasse, on October 9, 2000, the county granted to union employees a 47¢ per hour raise, thus making equal the hourly pay for both union and non-union employees. The question in dispute was whether the county should be required to retroactively implement the raises it declined to grant earlier. The ALJ ruled that it was.

[¶ 34.] Affirming the ALJ, the circuit court ordered the county to compensate union members "for back pay at the rate of 22¢ an hour for the year 1999 and an additional 25¢ an hour for the year 2000," plus any other employer mandated payments for those years. Thus the court forced the county to implement its last best offer of 1999, and inferred that the county, absent its unfair labor practices, would have granted a 25¢ per hour raise from the beginning of 2000, as it had for non-bargaining unit county employees. The court also ordered the county to pay interest on this back pay, to be calculated up to October 9, 2000, when the county equalized its pay scales for all employees.

[¶ 35.] To the extent the court reasoned that the county was required to implement its last best offer and that it was an unfair labor practice not to implement that offer, the court's decision was error, as we explained earlier. However,

both the court and the ALJ found other bases for concluding that the county committed unfair labor practices. Unlike the circuit court, however, the ALJ did not find that the county committed an unfair labor practice by not implementing its last best offer. Instead, the ALJ ruled, first, that the county's "wage increase to non-unit workers in 1999, while denying that same raise to union members, was an unfair labor practice under SDCL 3–18–3.1(1) and (3);" and, second, that the county negotiator's "threat to withhold the wage increase was an unfair labor practice under SDCL 3–18–3.1(5)." The circuit court affirmed these conclusions, but also held, contrary to the ALJ's finding, that the county's actions "were intended to discriminate in regard to terms and conditions of employment to discourage membership in an employee organization," in violation of SDCL 3–18–3.1(3). Thus, aside from the erroneous conclusion that the county was required to implement its last best offer, there remained three additional findings of an unfair labor practice. We uphold the circuit court on these conclusions. Therefore, we must determine whether back pay could be awarded.

**(c) Award of Back Pay**

[¶ 36.] Do the unfair labor practices found here authorize the department to order back pay? Other than the authority it cited for imposing the last best offer requirement, the circuit court did not cite any authority for its back pay ruling; however, it incorporated the conclusions entered by the ALJ in the Bon Homme County case. In examining the ALJ's reasoning, we find that while he did not cite any specific South Dakota authority for the back pay remedy, either from statute or regulation, he did indicate that he

---

trary, the ALJ specifically ruled that the "County did not commit an unfair labor prac-

tice by not implementing its entire last, best and final offer at impasse."

resorted to National Labor Relations Board decisions for guidance on defining an unfair labor practice. In some parts, SDCL ch 3–18 appears to be patterned after the National Labor Relations Act (NLRA). Indeed, Section 8(a)(1) of the Act, 29 USC § 158(a), defining employer unfair labor practices, is similar, and in many instances identical, to SDCL 3–18–3.1. Nothing in our statutes, however, specifies that payment for back pay is an available remedy for an unfair labor practice. The only expressed powers with respect to enforcement in unfair labor practices are conferred in SDCL 3–18–3.3: "The Department of Labor *shall promulgate rules* pursuant to chapter 1–26 to specify procedures to enforce the provisions of 3–18–3.1 and 3–18–3.2." *Id.* (1993) (emphasis added).

■ [¶ 37.] In contrast to South Dakota law, the NLRA specifies the types of remedies available. In § 10(c), 29 USC § 160(c), the Act specifically authorizes orders requiring back pay. As the court wrote in *Nat'l Labor Relations Bd. v. Otis Hospital,* 545 F.2d 252, 257 (1stCir.1976):

> The Board's authority to order relief stems from section 10(c) of the Act, 29 USC § 160(c), which provides that upon finding that an employer has committed an unfair labor practice, the Board shall order the employer "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter...." The remedial power of the Board under this section "is a broad, discretionary one, subject to limited judicial review[,]" *Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964), and the Supreme Court has held that an order of the Board will not be disturbed "unless it can be shown that the order is a patent attempt to achieve

ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Elec. & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). The policies of the Act include deterring unfair labor practices and making employees whole for losses incurred as a result of such practices. *See Nathanson v. NLRB,* 344 U.S. 25, 27, 73 S.Ct. 80, 97 L.Ed. 23 (1952). Both ends are served by the order here.

*Id.* South Dakota law has no equivalent to § 10(c) of the NLRA.

[¶ 38.] We view as distinguishable the cases cited by the unions to support the back pay remedy. In *Rininger v. Bennett County Sch. Dist.,* 468 N.W.2d 423 (S.D. 1991) and *Cox v. Sioux Falls Sch. Dist.* 49–5, 514 N.W.2d 868 (S.D.1994), this Court found no error where an order from the department placed employees in the position they would have been in had the employees not been aggrieved. These were not unfair labor practice cases. They were cases where teachers sought to enforce existing contracts. Their wages had been set in accord with their contracts. Here, we confront instances where the parties were only in negotiations for an agreement. There was no contract to enforce.

■ [¶ 39.] Despite the lack of specified remedies in our labor statutes, this Court ruled almost three decades ago, in an unlawful discharge case, that where an unfair labor practice occurs, administrative remedies include "back pay." *Gen. Drivers and Helpers Union v. Brown County,* 269 N.W.2d 795, 803–04 (S.D.1978). There, the Brown County Sheriff committed an unfair labor practice, in violation of SDCL 3–18–3.1(1), (2), (3), and (6), when he fired two deputy sheriffs because of their public employee union activities. The department ordered the deputies rein-

stated with back pay and no loss of seniority benefits. This Court upheld that order. Thus we have authority for awarding back pay in an unfair labor practice case. Still, we have never dealt with the question whether compensation can be awarded in an unfair labor practice case involving bad faith bargaining, as opposed to wrongful discharge. Nonetheless, in *Kermmoade v. Quality Inn,* 2000 SD 81, ¶ 23, 612 N.W.2d 583, 590, we wrote that the "[d]epartment may perform 'any' act 'necessary' to perform its quasi-judicial functions ... with every 'implied power' necessary to effectuate all of its 'express powers.'" *Id.* (citing *Romey v. Landers,* 392 N.W.2d 415, 419 (S.D.1986)).[7] Quasi judicial powers include "awarding compensation ... or performing any other act necessary to effect the performance of a quasi judicial function[.]" SDCL 1–32–1(10).

[¶ 40.] Although we must leave for another day the question whether the department can award compensation in any instance where an unfair labor practice may be found, we conclude that under the facts here, such an award was appropriate. Counsel for the counties argues the department and the circuit court "simply decided that [the counties] should have granted a wage increase to bargaining unit workers commensurate with that provided to non-bargaining unit workers, despite the fact that bargaining unit workers were already receiving benefits and protections far greater than their non-unit counterparts."

[¶ 41.] These arguments are not borne out in the record. First, the counties provide no facts to support their assertion that union members were receiving greater benefits and protections. Second, the department and circuit court did not decide that the bargaining unit members should receive a raise simply because the non-bargaining unit members did. It is apparent from the record that the only reason the bargaining unit members did not receive their raises at the same time as other county employees was because of the unfair labor practices committed by the counties. Both counties had previously authorized their bargaining representative to offer union members the same raises they offered non-union employees. And although in 1999 the circuit court had to infer that the union members would have received a 25¢ raise, such an inference was entirely reasonable because the county later brought the wage scale up to the scale the non-bargaining unit members were receiving. There was no genuine impasse on the wage issue. The impasse was with the insistence by both counties that their management rights clause be part of the agreement.

[¶ 42.] The counties cite *Kierstead v. City of Rapid City,* 248 N.W.2d 363 (S.D. 1976), in support of their argument that the back pay orders were illegitimate. In that case, the Court explained that the power to set compensation for municipal employees was vested in the governing

---

**7.** The Department of Labor possesses power to perform "quasi-judicial function[s]," which is defined in SDCL 1–32–1(10) as "an adjudicatory function exercised by an agency, involving the exercise of judgment and discretion in making determinations in controversies. The term includes the functions of interpreting, applying, and enforcing existing rules and laws; ... determining rights and interests of adverse parties; evaluating and passing on facts; *awarding compensation;* ... or performing any other act necessary to effect the performance of a quasi-judicial function[.]" *Id.* (emphasis added). However, the power to award compensation is not explicitly conferred in connection with labor disputes. Compare workers' compensation statutes, where the department is explicitly given the power to award compensation. See SDCL Tit 62, *et seq.,* and SDCL 62–2–5, granting to the department power to "carry out and enforce the provisions of this title."

body of the municipality. *Id.* at 366. Therefore, the Court held that only a governing body had the authority to act on grievances that "involve the exercise of an executive or legislative power of the governmental agency or the performance of a governmental function." *Id.* (citation omitted). Here, however, the department and the circuit court did not set wages for the union employees. They merely enforced the wage increases the union employees would have received but for the unfair labor practices committed by the counties. The counties had already authorized those raises, but then employed unfair labor practices to withhold them. Thus, we affirm the remedies ordered by the circuit court.

### 5. Time Barred Complaint

[¶ 43.] Bon Homme County contends that the circuit court erred in concluding that the unfair labor practice complaint was not time barred. SDCL 3–18–4 provides that "[a]ny complaint brought under the provisions of §§ 3–18–3.1 and 3–18–3.2 shall be filed with the Department of Labor within sixty days after the alleged commission of an unfair labor practice occurs or within sixty days after the complainant should have known of the offense." Bon Homme County argues that the unions should have known of the county's implementation of a management rights clause nearly two years before its implementation. However, as we noted above, it was not the implementation of the clause that constituted an unfair practice. Rather, it was the county's failure to provide a rationale for its implementation. The commission of this unfair practice was ongoing up and until the complaint was filed. Thus, the complaint was not time barred.

[¶ 44.] Lastly, during the pendency of this appeal, the unions moved to strike certain portions of the amicus curiae briefs. To the extent that these briefs asserted matters not in the record, we have disregarded them. We have considered the remainder of the counties' assertions and find them to be without merit.

[¶ 45.] Affirmed in part and reversed in part.

[¶ 46.] GILBERTSON, Chief Justice, and MEIERHENRY, Justice, and VON WALD, Circuit Court Judge, and MILLER, Retired Justice, concur.

[¶ 47.] VON WALD, Circuit Court Judge, sitting for SABERS, Justice, disqualified.

[¶ 48.] MILLER, Retired Justice, sitting for ZINTER, Justice, disqualified.