**Robert L. WANG, Jerry Tarrant, and George Wells, Appellants,**

v.

**Bev PATTERSON, Auditor for City of Sturgis, Appellee.**

No. 17177.

Supreme Court of South Dakota.

Considered on Briefs Nov. 30, 1990.

Decided May 1, 1991.

Rehearing Denied May 24, 1991.

Bryce A. Flint of Jackley & Flint, Sturgis, for appellants.

John T. Hughes of Morman, Smit, Hughes, Strain, Molstad & Haivala, Sturgis, for appellee.

SABERS, Justice.

Robert L. Wang, Jerry Tarrant, and George Wells (citizens) appeal a judgment denying their request for mandamus relief.

## FACTS

Citizens attempted to file petitions for referendum with Bev Patterson, the Auditor for the City of Sturgis (City). She refused to accept the petitions, on advice of legal counsel for City. Citizens initiated an action in circuit court requesting a writ of mandamus ordering her to accept and file the petitions. The purpose of the petitions was to call a referendum on specific resolutions of condemnation of land for a new airport for Sturgis. The relevant history of the Sturgis airport is set forth below.

1. On November 3, 1986, an airport committee was appointed by the mayor.

2. The city engineer proceeded to supervise preparation of several alternative master plans for the airport.

3. On December 21, 1987, the city council passed a motion to proceed with alternative plan #11 as the master plan. This plan involved moving the airport.

4. On February 16, 1988, the city council passed a motion to approve an airport site selection study.

5. On March 6, 1989, the city council passed a motion "to amend the airport master plan *to include an additional 40–50 acres of land & to commit to land condemnation if required if there is a problem with land acquisition.*" (emphasis added).

6. On June 19, 1989, a motion was passed authorizing the mayor to submit applications for federal grants.

7. On February 5, 1990, a motion was passed to authorize the mayor to sign purchase agreements for some of the land for the proposed airport.

8. On February 20, 1990, condemnation resolutions were presented to the council and tabled.

9. On March 5, 1990, the condemnation resolutions were again discussed by city council.

10. On April 2, 1990, the city council voted to adopt the condemnation resolutions.

11. On April 16, 1990, the citizens' attempt to file petitions for referendum was rejected.

On April 18, 1990, citizens filed their application for writ of mandamus. A hearing was held on May 2, 1990. On May 22, 1990, Circuit Judge Warren Johnson ruled that the resolutions of condemnation constituted administrative decisions not subject to referendum and entered a judgment dismissing citizens' application for writ of mandamus. Citizens appeal. We reverse and remand.

## ISSUE

WHETHER THE RESOLUTIONS OF CONDEMNATION WERE ADMINISTRATIVE AND NOT SUBJECT TO REFERENDUM, OR LEGISLATIVE AND SUBJECT TO REFERENDUM.

## DECISION

The right of the people to refer legislative acts to a public vote is constitutionally established. S.D. Const. art. III, § 1. Historically, South Dakota law did not distinguish between legislative and administrative decisions in determining what was "subject to referendum."[1] *See generally,* C. Lowe, *Restrictions on Initiative and Referendum Powers in South Dakota,* 28 S.D.L.Rev. 53 (Winter 1982). In 1985, *Baker v. Jackson,* 372 N.W.2d 142 (S.D.1985), discussed the legislature's role to provide

for a distinction between legislative and administrative actions in referendum cases. In 1986, in response to *Jackson,* the legislature adopted SDCL 9–20–18 and 19.

SDCL 9–20–18 provides:

The Legislature finds that in making past grants of decision-making authority to municipal governing authorities, its intent was to grant that authority to the governing bodies of municipalities and that such actions, unless otherwise excluded from the referendum and initiative process by other state law, *are subject to* the initiative and referendum process. Therefore, the contrary holding in *Baker v. Jackson,* 372 NW2d 142 (SD, July 31, 1985) is hereby abrogated. (emphasis added).

The abrogated portion of *Jackson* provided: "[w]hen the legislature grants or vests a particular power in the municipal governing authorities and not the corporate entity, such a grant of power is precluded from referendum elections." *Id.* at 148. SDCL 9–20–18 reverses this statement and provides that decision-making authority granted to municipal governing bodies is subject to referendum unless otherwise excluded.

Through SDCL 9–20–19, the legislature then excluded administrative decisions from referendum and distinguished them from legislative decisions by providing that:

Any legislative decision of a governing body is subject to the referendum process. A legislative decision is one that enacts a permanent law or lays down a rule of conduct or course of policy for the guidance of citizens or their officers. Any matter of a permanent or general character is a legislative decision.

No administrative decision of a governing body is subject to the referendum process, unless specifically authorized by this code. An administrative decision is one that merely puts into execution a plan already adopted by the governing

---

**1.** SDCL 9–20–6 provides in part:
The required number of voters residing in any municipality may file within twenty days after the publication of *any ordinance or resolution subject to referendum* a petition with the auditor or clerk, requiring the submission of any such ordinance or resolution to a vote of the voters of the municipality for its rejection or approval. (emphasis added).

body itself or by the Legislature. Supervision of a program is an administrative decision. Hiring, disciplining and setting the salaries of employees are administrative decisions.

SDCL 9–20–19.

■ Whether these resolutions of condemnation were legislative or administrative, is determined by the new statutes, prior case law, and general principles of law. Since this distinction between legislative and administrative decisions is new to South Dakota law, we have reviewed the case law of other states and have concluded generally that,

> The [distinction] is rooted in realism.
> Clearly, all municipal action cannot be subject to local review by the electorate. 'If government is to function there must be some area in which representative action will be final. In many situations it is difficult to determine how far the limitations should go. The courts must draw the line in these situations and in so doing must balance two interests—the protection of city government from harassment as against the benefits of direct legislation by the people.'

*D'Ercole v. Mayor and Council of Norwood,* 198 N.J.Super. 531, 487 A.2d 1266 (App.Div.1984) *citing Cuprowski v. City of Jersey City,* 101 N.J.Super. 15, 242 A.2d 873 (Law Div.1968).

Although a limited portion of *Jackson* has been statutorily abrogated, the remainder of that opinion is good law and its analysis is particularly helpful in this case. In *Jackson,* the City of Murdo adopted a budget which included enough money to pay two salaried police officers. The budget did not specify the manner in which the police funds were to be spent. Subsequently, the city council voted to hire a second police officer. Certain citizens filed petitions calling for a referendum on the issue of hiring the additional police officer. City Auditor Jackson refused to call the referendum to a vote. The trial court issued a writ of mandamus ordering Jackson to hold the referendum. On appeal to this Court, Jackson argued, among other things, that the city council's decision to hire a second police officer was not referable because it was an administrative act. Relying on *City of Mission v. Abourezk,* 318 N.W.2d 124 (S.D.1982) [2], Jackson argued that since the budget allocated enough to pay two police officers, the citizens should have referred the budget, rather than the decision to hire the second police officer.

This Court held that the citizens could refer the decision to hire the second police officer and distinguished *Abourezk* by noting:

> [w]e cannot equate, however, the initial resolution to purchase property in *Abourezk* with the construction and passing of the budget ordinance in this case. In *Abourezk,* the city's intentions were clear and citizens were apprised of future actions. Here, however, the budget ordinance was merely a lump sum allotment of funds for the police department.... Thus, the ordinary person had no notice of and no way of ascertaining further police personnel resolutions.

*Jackson,* 372 N.W.2d at 147.

Similar arguments are presented in this case. The trial judge found that the city had adopted a master plan for the airport. He then determined that the condemnation of certain land within that master plan was merely an administrative action implementing the prior legislative decisions in the master plan. Thus, City argues that citizens should have referred the master plan rather than the resolutions of condemnation.

Citizens note that the master plan did not authorize condemnation and thus did not apprise them of the fact that land *would* be

---

**2.** In *Abourezk,* the City of Mission passed a resolution authorizing the purchase of certain property. A contract for the purchase of that property was executed. Citizens referred the resolution to the electorate and the resolution was voted down. The prospective land sellers claimed that the contract should have been referred rather than the resolution. This Court disagreed and upheld the referendum of the resolution.

condemned for the proposed airport.[3] They contend that the resolutions of condemnation were city's first actions which apprised them that the city was definitely going to condemn specific land for the proposed airport. Thus, they claim they should be allowed to refer the resolutions of condemnation.

We agree. "Where discretion is left to the local government as to what it may do, when the local government acts, it acts legislatively and its actions are subject to normal referendum procedure." 5 McQuillin, *Municipal Corporations* § 1655. In applying the "legislative" versus "administrative" distinction this Court will apply a liberal rule of construction permitting rather than preventing, citizens from exercising their powers of referendum. *See generally* 5 McQuillin, *Municipal Corporations* § 1651 and cases cited therein. The December 21, 1987 motion to adopt alternative # 11 as the master plan did not direct the condemnation of any land. Similarly, the March 6, 1989 motion simply indicated that the city council was willing to proceed with land condemnation *"if required."* The city council still retained discretion to decide whether condemnation was necessary. When the city council passed the resolutions of condemnation on April 2, 1990, they were exercising that discretion and their decision was legislative and subject to referendum.

■ Under SDCL 9–20–18, *any* legislative decision-making authority granted to municipal governing bodies is subject to referendum unless otherwise excluded. These resolutions of condemnation "enacted a permanent law," laid down a "rule of conduct or course of policy" for the guidance of "their officers" and did not "merely put into execution a plan already adopted." SDCL 9–20–19.

■ Our analysis is supported by other considerations which relate to the power of eminent domain. This Court has previously held that the judiciary's role in reviewing

an exercise of the power of eminent domain is limited in scope. Where public use is involved, the necessity of exercising the right of eminent domain is not open to judicial investigation or determination. *City of Bristol v. Horter*, 73 S.D. 398, 43 N.W.2d 543 (1950); *Chicago, M & St. P. Ry. Co. v. Mason*, 23 S.D. 564, 122 N.W. 601 (1909). Thus, the only way for citizens to challenge the necessity of specific condemnations is through referendum.

The airport "master plan" may have indicated the possibility of condemnation but it did not authorize condemnation of the property in question. If we held that citizens had to call for referendum on the "master plan," we would be effectively requiring that citizens initiate the referendum process whenever their city takes any action which merely indicates that condemnation might occur. Because of the judiciary's limited role in reviewing the exercise of eminent domain, we would be dramatically curtailing the citizens' power to call for a referendum to challenge the necessity of specific condemnations.

The City also argues that SDCL 50–7–4 is the "plan" which the condemnation resolutions are implementing. This statute simply authorizes municipalities to build and maintain airports and authorizes the use of eminent domain to do so. It does not create a "plan" of condemnation which would apprise the citizens of the municipality's decision to condemn. Moreover, City's argument would mean that citizens could never call for a referendum on the condemnation of land for a municipal airport because the time to call for a referendum of SDCL 50–7–4 has long since expired.

The decision of the circuit court is reversed and remanded to enter an order requiring Patterson to accept and file the petitions.

MILLER, C.J., and MORGAN, Retired Justice, concur.

---

**3.** The first mention of condemnation which can be ascertained from the record in this case is the March 6, 1989 motion to add the additional 40–50 acres and to commit to condemnation, *if*

*required.* On April 2, 1990, the city council enacted the resolutions of condemnation *determining that condemnation was now necessary* for the specific land.

WUEST and HENDERSON, JJ., specially concur.

AMUNDSON, J., not having been a member of the Court at the time this action was submitted did not participate.

WUEST, Justice (specially concurring).

In *Baker v. Jackson, supra,* I dissented claiming the appointment of the second policeman was an administrative decision, not subject to referendum. Justice Wollman dissented on a different issue. Thereafter, the legislature changed the law in conformance with our dissents. In the present case, I believe the resolutions of condemnation are legislative and subject to referendum. Therefore, I join the majority opinion.

HENDERSON, Justice (specially concurring).

It appears that the State Legislature has finally made a distinction between legislative and administrative actions, in referendum cases, by enacting SDCL 9–20–18 and SDCL 9–20–19. The *Jackson* decision, written by this special writer, and which was joined by Chief Justice Fosheim and our immediate past Senior Justice, now retired Morgan, J., was decided in 1985. Effective July, 1986, two new sections were added to our State Code, SDCL 9–20–18 and SDCL 9–20–19. Thus, the Legislature has spoken.

The majority writer characterizes *Jackson* as still being "good law" and that "it's analysis is particularly helpful in this case." As the majority writer expresses, and I agree, "a limited portion of *Jackson* has been statutorily abrogated."

*Jackson* was written under the law then existing. Since early statehood, the legislature has seen fit, on occasions, to modify or pass a law to change the law within its function as a branch of government. So it is nothing new, by any matter or means, to now see and read where the State Legislature has responded to a decision of this Court.

In essence, legislative actions are now referable and administrative actions are not. Once again, I concur specially to point out that until 1986, South Dakota did not draw a distinction between legislative and administrative decisions at the municipal level. Our decision in *Jackson* reflected the current status of the law at that point in time. However, *Jackson* is, as the majority points out, still good law and the decision therein withstands scrutiny even after the legislative change.