#24978-a-JKK
**2009 SD 30**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

DEBORAH AND DARNELL OKERSON,          Petitioners and Appellants,


     v.


THE COMMON COUNCIL OF
THE CITY OF HOT SPRINGS, CARL
OBERLITNER, IN HIS CAPACITY AS
MAYOR, AND CHERYL WAIT, IN HER
CAPACITY AS CITY FINANCE OFFICER,
ALL IN THEIR REPRESENTATIVE
CAPACITIES AND INCLUDING ANY
SUCCESSORS IN INTEREST,          Respondents and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE SEVENTH JUDICIAL CIRCUIT
FALL RIVER COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JEROME A. ECKRICH, III
Judge

\* \* \* \*

COURTNEY R. CLAYBORNE of
Clayborne, Loos, Strommen & Sabers LLP      Attorneys for petitioners
Rapid City, South Dakota      and appellants.


JAMES G. SWORD of
Farrell, Farrell and Ginsbach PC      Attorneys for respondents
Hot Springs, South Dakota      and appellees.

\* \* \* \*

CONSIDERED ON BRIEFS
FEBRUARY 17, 2009

OPINION FILED 4/29/09

#24978

KONENKAMP, Justice

[¶1.]     Deborah and Darnell Okerson petitioned the circuit court for a writ of mandamus to compel the Common Council of the City of Hot Springs, the Mayor and City Finance Officer (collectively Council) to submit to the voters a referendum on the settlement of a lawsuit concerning the construction of an addition to the golf course in the City of Hot Springs. The circuit court denied the writ. Because the stipulated facts presented to the circuit court do not support the grant of the writ, we affirm.

## Background

[¶2.]     The parties determined that no evidentiary hearing was necessary, and this matter was submitted to the circuit court on stipulated facts and exhibits. The facts before the circuit court indicate as follows:

[¶3.]     On June 17, 2002, the Council voted to enter into an agreement with Steve and Carla Simunek for the construction of an additional nine holes to the Hot Springs golf course. On July 1, 2002, the Council amended the agreement to add Kelvin Lorenz as a party to the development and construction of the addition. Both meetings were properly called and appropriate notice was given to the public. In 2006, the City of Hot Springs commenced litigation against the Simuneks, Lorenz and other entities involved in that project. To resolve that litigation the parties entered into a stipulation for settlement. The stipulation for settlement was signed by all parties and the Attorney General. The stipulation for settlement was also approved by the court handling the litigation. On February 19, 2008, the Council approved the settlement. In the settlement, the parties were to enter a land exchange, transfer certain land, make a lump sum payment of $625,000, close a

rubble pit, move the city transfer station, and adopt appropriate zoning ordinances to lift a moratorium on building permits related to the golf course. One of the stated reasons for the settlement was because "the parties are desirous of fulfilling the terms of what they understand the original agreement was for the construction of the addition Nine Holes of the Golf Course."

[¶4.] Referendum petitions were filed seeking to challenge the approval of the settlement by the Council. The Council rejected the referendum petitions and subsequently amended the terms of the stipulation to reflect certain parcels of real estate in the land transfer. The amended stipulation for settlement was again approved by the parties, the Attorney General and the court. The Okersons filed a petition for a writ of mandamus seeking to compel the referendum vote.

[¶5.] The circuit court found that the 2002 decision to construct the additional nine holes to the golf course was a legislative act subject to referendum. However, no referendum petition was filed challenging that action. Significantly, the court found the terms of the 2002 agreement and the 2008 stipulation for settlement "consistent in all material respects" and that the stipulation for settlement "merely put into execution" the 2002 agreement. Further, the Okersons did not allege that the stipulation for settlement violated or was inconsistent with the 2002 agreement. Therefore, the circuit court determined that the referendum petitions related to a subsequent administrative action concerning the golf course settlement and was not subject to the referendum process. The circuit court denied the writ of mandamus. The Okersons appeal contending that the circuit court abused its discretion in denying mandamus relief.

## Analysis and Decision

[¶6.] "Mandamus is a potent, but precise remedy. Its power lies in its expediency; its precision in its narrow application. It commands the fulfillment of an existing legal duty, but creates no duty itself, and acts upon no doubtful or unsettled right." Sorrels v. Queen of Peace Hosp., 1998 SD 12, ¶ 6, 575 NW2d 240, 242. "To prevail in seeking a writ of mandamus, the petitioner must have a clear legal right to performance of the specific duty sought to be compelled and the respondent must have a definite legal obligation to perform that duty." *Id.*; *see also* Woodruff v. Bd. of Com'rs for Hand County, 2007 SD 113, ¶ 3, 741 NW2d 746, 747. "The circuit court has discretion in granting or denying a writ of mandamus. Consequently, the standard of review on appeal is abuse of discretion." Black Hills Cent. R. Co. v. City of Hill City, 2003 SD 152, ¶ 9, 674 NW2d 31, 34.

[¶7.] The facts, as set forth above, are those that appear in the rather limited record before the circuit court. In arguing that the circuit court abused its discretion, however, the Okersons insert in their appellate brief additional facts about the 2002 decision to develop the addition to the golf course. They assert that following the 2002 decision by the Council to proceed with the golf course construction, the Attorney General's office declared the Council's agreement invalid. No reasoning, explanatory facts, or evidence is provided related to that decision. These facts are introduced without adequate citation to any portion of the record and were not included in the stipulated facts the parties submitted to the circuit court. Notably, the Okersons' petition does not allege that the original agreement

was void ab initio as they now contend on appeal. The Okersons also proposed no finding of fact or conclusion of law that the original agreement was void ab initio.

[¶8.]    On appeal, the Okersons argue that because the agreement in 2002 was later ruled void by the Attorney General the action taken in 2008 was the first valid and binding decision on the construction of the golf course development by the Council. As a result, the Okersons assert that the settlement decision essentially became a "legislative" act. While this may be an interesting question, it was not the one presented to the circuit court. It is advanced here for the first time. The Okersons' position requires this Court to speculate on the legal relationship between the parties and the validity of the underlying agreement in contravention to the stipulated facts and settled record. Given the absence of any supportive record evidence or any indication this argument was presented to the circuit court, we will not address this issue for the first time on appeal. *See* Argus Leader v. Hagen, 2007 SD 96, ¶ 34, 739 NW2d 475, 484 (holding a claim not previously raised or ruled on by the circuit court was waived in an appeal from the denial of a writ of mandamus). The Okersons' argument suffers from the fatal flaw of being premised upon facts that are not contained within the settled record. "This Court has repeatedly instructed that the party claiming error carries the responsibility of ensuring an adequate record for review." State v. Andrews, 2007 SD 29, ¶ 9, 730 NW2d 416, 420.

[¶9.]    An analysis of the facts as contained in the record is controlled by SDCL 9-20-19. That statute provides:

> Any legislative decision of a governing body is subject to the referendum process. A legislative decision is one that

> enacts a permanent law or lays down a rule of conduct or course of policy for the guidance of citizens or their officers. Any matter of a permanent or general character is a legislative decision.

> No administrative decision of a governing body is subject to the referendum process, unless specifically authorized by this code. An administrative decision is one that merely puts into execution a plan already adopted by the governing body itself or by the Legislature. Supervision of a program is an administrative decision. Hiring, disciplining and setting the salaries of employees are administrative decisions.

Based on the stipulated facts, the circuit court was correct determining that the decision made in 2002 to develop the addition to the golf course and specify terms was a "legislative" decision as defined in SDCL 9-20-19. That initial decision established a "rule of conduct or course of policy for the guidance of citizens or their officers" and was a matter of "permanent character." As such it was subject to the referendum process. However, as the circuit court recognized, no challenge was filed at that time.

[¶10.] Later, in 2008, the Council approved the stipulation for settlement to resolve the litigation surrounding the decision to build the nine-hole addition to the golf course. At that point, as the statute provides, the decision "merely put[ ] into execution a plan already adopted by the governing body itself." The circuit court also found that the stipulation for settlement was "within the parameters of the 2002 agreement." A comparison of these two documents supports that conclusion. The 2002 agreement set forth a plan for the private development of a nine-hole golf course to be later acquired by the City. That agreement projected an actual cost of between one and one-and-one-half million dollars. The payments were based on

one-half of the increase in revenue for golf course fees. In addition, land exchanges were set forth and the establishment of a rural service district was provided. The 2008 stipulation for settlement also contemplated the acquisition of the privately built nine-hole addition to the golf course; the use of land exchanges and rural service districts; a lump sum payment of $625,000 made contingent on financing and payment by June 1, 2008; and, in the event payment was not made by that date, the annual payment reverted to one-half of the increase in revenue from golf course fees as in the 2002 agreement.

[¶11.]     Although there are admittedly differences in the terms from the original agreement, as one would most likely expect in a settlement, the circuit court aptly described the situation:

> The 2002 decision contemplated a general plan to accomplish the goal via construction by private parties, land swap and purchase. The plan, though not specific in every detail, fairly describes a rather comprehensive and reasonably specific mechanism to acquire, develop, construct, acquire and pay for the golf course.
>
> The [t]erms of the Settlement Agreement (or as amended) when compared with the City's 2002 decision to purchase/construct the golf course—as embodied in the July 2002 Amended Memorandum Agreement—are consistent in all material respects.
>
> For example, paragraph 1 of the 2002 Amended Memorandum provides: "Owners agree to develop an additional 9-holes for the golf course. . . . When the course is developed it will be deeded by the Owners to the City with the price to be set as the actual cost for the owners developing said golf course. Said cost is projected by the architect between One and One and One-half million dollars.
>
> The settlement price is $625,000.00. Significantly, the Okersons do not claim that the 2008 Settlement

> Agreement (as amended) violates or is otherwise inconsistent with the provisions of the 2002 Amended Agreement.
>
>             \*   \*   \*
>
> In this case, the 2002 Amended Memorandum does not provide a liquidated price for the golf course. However, a citizen on notice of the City's 2002 decision would know the City intended to enter into an agreement for the construction of a golf course and pay up to 1 ½ million dollars for the construction.
>
> The City agreed in 2002 to a sufficiently identifiable formula to determine a payment price—along with other terms of payment and obligations of performance. The golf course construction is substantially complete. The City has determined it has an obligation to perform under the 2002 Agreement, pending lawsuit notwithstanding. The decision to settle the lawsuit within the parameters of the 2002 agreement is simply an administrative decision.

The dissent's position was neither argued to nor considered by the trial court. Yet, even if we were to accept the dissent's argument that the settlement agreement required payment from "a completely different revenue source," there is a broader question presented by this appeal that has been lost between the procedural posture of this case and the lack of an adequate record for our review: Whether a decision to enter into a settlement to resolve pending litigation is referable as a legislative act.

[¶12.]      In analyzing the administrative versus legislative distinction, we have noted that the determination is informed by the statutes, case law, and also general principles of law. Wang v. Patterson, 469 NW2d 577, 579 (SD 1991). A review of those sources has led this Court to the general observation that:

> The [distinction] is rooted in realism. Clearly, all municipal action cannot be subject to local review by the

> electorate. If government is to function there must be some area in which representative action will be final. In many situations it is difficult to determine how far the limitations should go. The courts must draw the line in these situations and in so doing must balance two interests–the protection of city government from harassment as against the benefits of direct legislation by the people.

*Id*. As a leading commentator has recognized, the settlement of claims in litigation has been determined not to be subject to the initiative and referendum process. 5 McQuillin, *Municipal Corporations*, §16:56 (3rd ed 2004 & Supp 2008).

[¶13.]     We agree that classifying a decision to settle a pending lawsuit as an administrative act not subject to the initiative or referendum process is based on a "distinction rooted in realism." *Wang*, 469 NW2d at 579. In rejecting an initiated measure aimed at requiring the settlement of certain claims of a city against former city officials, the Minnesota Supreme Court recognized:

> It is the exercising of an administrative function. We think the measure is one that calls for investigation and discretion, and, if such matters are not to be met and handled as a part of the daily routine of business of a municipality, but must be submitted to the people to make a law for each controversy that may arise, we are drifting from the ideals of representative government.
>
> * * *
>
> The matter involved in the proposed ordinance is one that calls for investigation and the exercise of discretion and business judgment. It is inherently of such character that the voters, no matter how intelligent, cannot be expected to investigate and have access to all the information which we may assume the city council, with the aid of their attorney, acquire. Full information should be obtained and carefully considered before a conclusion is reached.

Oakman v. City of Eveleth, 203 NW 514, 517 (Minn 1925). [1] *See also* Hous. & Redevelopment Auth. of Minneapolis v. City of Minneapolis, 198 NW2d 531, 536-37 (Minn 1972) (stating a proposed city charter amendment that would have allowed citizens to refer actions such as the settlement of lawsuits could create a "chaotic situation" in city government); Peterman v. Village of Pataskala, 702 NE2d 965, 967 (OhioAppCt 1997) (recognizing a settlement prevented a municipal referendum as it was not a "legislative action"). The dissent's self-generated contention to allow referral of litigation settlements could create "chaotic situations" extending far beyond the facts of this case.

[¶14.]	Consequently, we hold that the Council's decision concerning the 2008 stipulation for settlement was an "administrative" decision on the facts presented and therefore not subject to the referendum process.

[¶15.]	Affirmed.

[¶16.]	ZINTER, and MEIERHENRY, Justices, concur.

[¶17.]	GILBERTSON, Chief Justice, dissents.

[¶18.]	SABERS, Retired Justice, disqualified.

GILBERTSON, Chief Justice (dissenting).

[¶19.]	I dissent.

---

1.	It would be an untenable position if a municipality, after having the opportunity to weigh the merits of a lawsuit and confer with counsel, decided to settle litigation and that decision was determined referable. However, if the City were to ignore the benefits of settlement and proceed to a final court disposition, that judgment could not be referred. *See* Green Oak Twp. v. MHC, 661 NW2d 243, 246 n5 (MichAppCt 2003) (recognizing a referendum on a court judgment would violate separation of powers).

[¶20.]     The circuit court's letter to the parties, dated July 11, 2008, states that "[t]he *prime issue presented* is: Whether the City's February 19, 2008, decision to settle the golf course lawsuit is a legislative act or an administrative act?" (Emphasis added.)  The circuit court concluded that the 2008 Settlement Agreement was an administrative act.  As a consequence of this conclusion, the circuit court held that the 2008 Settlement Agreement was not subject to referendum, and refused to enter a writ of mandamus.  As a part of their argument that a writ of mandamus should have been granted, the Okersons appeal the legislative/administrative conclusion that ultimately led to the circuit court's denial.[2]

[¶21.]     "The circuit court has discretion in granting or denying a writ of mandamus," and "[c]onsequently, the standard of review on appeal is abuse of discretion."  *Black Hills Cent. R. Co.*, 2003 SD 152, ¶9, 674 NW2d at 34.  However, "[b]y definition, a decision based on an error of law is an abuse of discretion."  Credit Collection Servs., Inc. v. Pesicka, 2006 SD 81, ¶5, 721 NW2d 474, 476 (quoting State v. Vento, 1999 SD 158, ¶5, 604 NW2d 468, 469).  In these cases, the predicate question of "whether the [ ] decision [ ] was legislative or administrative is a question of law which we review de novo."  Kirschenman v. Hutchinson County Bd. of Com'rs, 2003 SD 4, ¶2, 656 NW2d 330, 332  (citing Voeltz v. Morrell & Co., 1997

---

2.     I agree with the conference opinion that the Okersons did not raise the argument that the 2002 Agreement was void at the circuit court level, and that this argument should not be considered on appeal.  However, the Okersons' claim that the 2008 Settlement Agreement was a legislative rather than administrative act is presented more broadly than simply the invalidity of the 2002 Agreement.  Therefore, the legislative/administrative determination is an issue properly before this Court.

SD 69, ¶9, 564 NW2d 315, 316) (overruled on other grounds by Bechen v. Moody County Bd. of Com'rs, 2005 SD 93, 703 NW2d 662).

[¶22.]    The circuit court determined that the 2008 Settlement Agreement was an administrative act, because "[t]he Terms of the Settlement Agreement . . . when compared with the City's 2002 decision to purchase/construct the golf course . . . are consistent in all material respects." Applying *Wang*, 469 NW2d 577, the circuit court concluded that "the legislative line was drawn six years ago (2002) – not five months ago." Therefore, the circuit court concluded that the 2008 Settlement Agreement, as an administrative act, was not subject to referendum. SDCL 9-20-19.

[¶23.]    "The construction of a written contract is a question of law for the Court to consider." Gul v. Ctr. for Family Med., 2009 SD 12, ¶8, 762 NW2d 629, 632 (citing Dirks v. Sioux Valley Empire Elec. Ass'n, 450 NW2d 426, 427-28 (SD 1990)). Contrary to the circuit court's conclusion, the two "contracts" made by the City of Hot Springs are materially different in how they pay for the golf course addition.

[¶24.]    The 2002 Agreement provides, in relevant part:

> I.  . . . The purchase price will be paid by the City paying to the [Simuneks] *50% of the added gross income* from golfing fees, membership fees and other miscellaneous fees over the existing income adjusted annually for inflation from those same items at the time the City takes over the golf course. The [Simuneks] will charge the City no interest.

(Emphasis added.)

[¶25.]    The 2008 Stipulation Agreement provides, in relevant part:

> 4.  [The City of Hot Springs] agrees to make a lump sum settlement on [ ] Simuneks claim . . . by making a one-time payment of $625,000.00. . . . The parties further agree that

> the lump sum payment of $625,000.00 is contingent upon the [*City*] obtaining *financing* from a commercial, private or governmental lender. This Agreement is contingent upon payment on or before June 1, 2008, of the $625,000.00 by [City] to [Simuneks]. . . . In the event payment hereunder *is made after* June 1, 2008, [Simuneks] shall be *entitled* to receive the annual payment of one-half of the increase in the golf course fees over and above the 2004 revenue received from golf course fees by the [City].[3]

(Emphasis added.)

[¶26.] Whereas the 2002 Agreement provides for *interest free* payments made out of the *added gross income* of the golf course, the 2008 Settlement Agreement permits the City to obtain funding for the lump sum payment from another, undefined source. Potentially, this undefined source will charge interest and require a defined payment amount. Most importantly, payments made to the undetermined lender apparently come from the City's general fund, rather than out of the added gross income of the golf course. This is a completely different revenue source.

[¶27.] Under the 2002 Agreement, the users of the golf course paid for the addition through the fees they paid at the golf course. With a "no interest, no deadline" obligation to pay, the addition plan presented to the citizens in 2002, colloquially, "paid for itself." Under the 2008 Settlement Agreement, every citizen of Hot Springs is required to pay for the addition through the City's general taxes.

---

3. While it is unclear from the record, if the lump sum payment was made after June 1, 2008, the 2008 Settlement Agreement requires annual payments from the increase in golf course fees similar to what was required under the 2002 Agreement. If this occurred, the lump sum payment appears to be made *in addition to* what was already being paid under the 2002 Agreement. Furthermore, under the 2008 Settlement Agreement, these annual payments appear to be made in perpetuity and not limited by a "grand total" as under the 2002 Agreement.

The 2008 Settlement Agreement effectively shifts the burden of paying for the golf course from those who benefit from its use to the general population.

[¶28.]    By authorizing the 2008 Settlement Agreement and the financing plan therein, the City has levied a tax upon its general population in order to pay for the golf course addition.  The City, essentially, argues that this taxation evades the referendum process because the project itself had been approved in 2002 and this realignment of the revenue source is an administrative act necessary to carry out the 2002 Agreement.  Through this method, the City appears to have found a loophole in funding major projects by getting initial public support through advertising the project as "no cost to non-users," then later refinancing the project through a settlement agreement that places the cost of the project on all of its citizens.

[¶29.]    The 2008 Settlement Agreement appropriates funding for the golf course in a wholly different manner from what was presented to, or anticipated by, the public under the 2002 Agreement.  "In applying the 'legislative' versus 'administrative' distinction this Court will apply a liberal rule of construction permitting rather than preventing, citizens from exercising their powers of referendum."  *Wang*, 469 NW2d at 580 (citing 5 McQuillin, *Municipal Corporations* §1655 and cases cited therein).  "The [distinction] is rooted in realism."  *Id*. at 579.  The 2008 Settlement Agreement, because it appropriates money from the City's general fund or otherwise shifts the revenue source for this project, is a legislative act.  In the words of SDCL 9-20-19, the 2008 Settlement Agreement hardly "puts

into execution a plan already adopted" by the City. Therefore, it is subject to referendum. SDCL 9-20-19.

[¶30.] In construing SDCL 9-20-19, we so held in the factually similar case of *Wang, supra.* Therein the City adopted a master plan for an airport, which we held did not preclude the referral of the City's subsequent decision to commence condemnation proceedings to build it. While condemnation was mentioned in the original master plan "if required," the second decision to invoke it was determined by this Court to be a legislative, rather than an administrative, decision.

[¶31.] Initiative and referendum "was to act as an ostensible safety valve and remedy for whatever ills might evolve in representative government." Baker v. Jackson, 372 NW2d 142, 144 (SD 1985) (holding abrogated on other grounds by 1986 S.L. Ch. 73, § 1, codified at SDCL 7-18A-15.1, 9-20-18, and 9-20-19.). Here, when the good citizens of Hot Springs read of the "pay as you go" plan adopted in 2002 by their City Council little did they realize that was synonymous with a plan of digging into their pockets to the total of $625,000, be they taxpaying golfers, non-golfers or invalids. This dispute has festered in the City government and the courts since 2002. It is time to end this dispute by the safety valve of a public vote rather than let it continue to fester into the future.

[¶32.] The circuit court erred in the legislative/administrative determination as a matter of law. Because the circuit court erred as a matter of law, it abused its discretion when it applied this error to deny the writ of mandamus. *See supra* ¶20. I would remand to the circuit court for findings consistent with this opinion.