#24060-a-JKM

**2007 SD 23**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

BRIDGEWATER QUALITY
MEATS, L.L.C.,                                        Plaintiff and Appellee,

v.

LEONARD HEIM and JEANNIE
HEIM, d/b/a J & L BISON RANCH,          Defendants and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
McCOOK COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE RONALD K. MILLER
Judge

\* \* \* \*

ROGER R. GERLACH                          Attorney for plaintiff
Salem, South Dakota                           and appellees.

JEFF ADEL of
Bridgman and Adel                             Attorneys for defendants
Wessington Springs, South Dakota       and appellants.

\* \* \* \*

CONSIDERED ON BRIEFS
ON JANUARY 8, 2007

OPINION FILED **03/07/07**

#24060

MEIERHENRY, Justice

[¶1.]    This action arises out of two separate agreements involving the slaughter and sale of buffalo. The first agreement involved Leonard and Jeannie Heim, d/b/a J&L Bison (collectively referred to as Heim) and Jason Sparling (Sparling), d/b/a Gourmet Bison and the second involved Sparling and Bridgewater Quality Meats, LLC (Bridgewater). Pursuant to these agreements, Heim delivered buffalo to Bridgewater for slaughtering over a two year period and on some occasions received the processed meat. In July of 2003, Bridgewater filed a small claims action alleging that Heim owed $7,986.58 for meat products received from Bridgewater. Heim removed the case to circuit court and counterclaimed seeking over $42,000.00 for sixteen buffalo he had delivered to Bridgewater. A jury trial was held on December 19, 2005, and the jury returned a verdict in favor of Bridgewater and against Heim on his counterclaim. Heim appeals and we affirm.

## FACTS

[¶2.]    The following facts are not in dispute. Heim operated a buffalo ranch in Jerauld County, South Dakota and entered into an agreement with Sparling, owner and operator of Gourmet Bison (hereinafter referred to as "the Heim-Sparling Agreement"). Heim agreed to purchase young buffalo, feed them, and take them to Bridgewater, a meat processor, for slaughter. In addition to the slaughter cost, Sparling agreed to pay $2.30 per pound hot hanging weight for the buffalo. Sparling would then take the meat for resale. In December of 1999, Heim made the first delivery of buffalo to Bridgewater and Sparling paid Heim pursuant to the terms of their agreement.

-1-

[¶3.]    Sparling subsequently began experiencing financial difficulties and approached Ilan Parente (Parente), owner of Bridgewater, regarding Sparling's obligations under the Heim-Sparling Agreement. Sparling explained that he was no longer financially able to pay Heim under their agreement. He asked Parente to continue slaughtering the buffalo Heim delivered to Bridgewater, but then also purchase the meat from Heim for the same price provided under the Heim-Sparling Agreement. Parente agreed that Bridgewater would continue to accept deliveries from Heim, but only agreed to pay Heim the current market rate of $1.90 per hot hanging weight for the buffalo meat, rather than the $2.30 per hot hanging weight as set forth in the Heim-Sparling Agreement. Accordingly, Sparling agreed that he would pay Heim the difference.

[¶4.]    At what point Heim began making deliveries pursuant to Sparling's agreement with Parente (hereinafter referred to as "the Sparling-Parente Agreement") is disputed. Heim testified that he began delivering buffalo to Bridgewater pursuant to the Sparling-Parente Agreement beginning with his February 2000 delivery of buffalo. Heim testified as follows:

> Q. The first animals you ever got paid by Bridgewater Quality
>     Meats was for a load you delivered in March of 2000; correct?
> . . .
>
> A. He was supposed to buy a load that I delivered in February.
> Q. What do you mean supposed to?
> A. When Jason Sparling couldn't pay me for the buffalo, Jason
>     and Ilan (Parente) had a conversation.
> Q. Wait. Were you part of that conversation between Jason and
>     Parente?
> A. No.
> Q. You weren't there?
> A. No.
> . . .

Q. Did you take a load of buffalo there in February of 2000?
A. Yes.
Q. Well, who told you to take them there?
A. Ilan (Parente).
Q. Do you know who ended up with the meat?
A. No.
Q. Do you know if Jason Sparling ended up with that meat?
A. No. I don't know who ended up with the meat of any of the buffalo that I took to Bridgewater.

[¶5.]    Parente denied receiving a delivery of buffalo from Heim in February of 2000. Parente testified that he had searched every record in Bridgewater's plant to try to locate documentation of a transaction with Heim on February 21, 2000 and that "there is no record for February 21 of 2000 for bison brought into Bridgewater Quality Meats by Leonard Heim." Parente claimed that, according to his records, the first delivery Heim made per the Sparling-Parente Agreement was in March of 2000. Parente testified as follows:

Q. Now you kind of distinguished the first load which was March 13, 2000, from the loads that were brought in after that.
A. Correct.
Q. Why is that?
A. The initial discussion that I had was not with Leonard Heim nor did I ever have a discussion with Leonard Heim about how many animals he had, what he expected to be paid for them, et cetra. I did not know Leonard Heim prior to that date that he brought them into my facility. The only person I knew at the time was an individual by the name of Jason Sparling.
Q. So this load of buffalo, the first load on March 13, 2000, how did they end up at that facility?
A. Jason Sparling contacted me, and he and I had been conducting business at the time for several months and informed me that he was unable to hold up his end of an agreement that he had with a family member of his, namely Leonard Heim, and if I would be kind enough to assist him in slaughtering those animals.

Parente further testified that after the first day of trial it struck him that the buffalo may have come into Bridgewater's facility listed under Gourmet Bison, Sparling's d/b/a. After checking his records for Gourmet Bison, he found a record indicating Gourmet Bison had delivered sixteen buffalo on January 12, 2000. However, he did not produce any record for Gourmet Bison indicating a February, 2000 delivery.

[¶6.] The parties continued their business agreement into 2001 until the buffalo market declined. Because of the extreme drop in the market, Parente informed Heim that he would no longer be able to afford to pay Heim for buffalo. However, Parente and Heim agreed that Heim would continue to deliver buffalo to Bridgewater. In return, Heim would receive buffalo meat for resale purposes and Parente would pay off his account gradually. Parente eventually zeroed out Heim's account.

[¶7.] Heim and Parente then entered into another agreement wherein Heim was allowed to purchase buffalo meat from Bridgewater on credit. Heim agreed to satisfy this account with buffalo he was currently raising. However, Heim failed to deliver the buffalo as agreed, which led Bridgewater to file this action.

[¶8.] After a three day trial, the jury returned a verdict in favor of Bridgewater for $7,986.58 for the amount of meat Heim had received from Bridgewater for resale purposes. The jury found against Heim on his counterclaim. Heim timely filed a new trial motion alleging that he had discovered new evidence consisting of records from the South Dakota Animal Industry Board (Animal Industry Board), a state agency that provides inspection services to small meat

processing and slaughter establishments,[1] which indicated that Heim had delivered buffalo to Bridgewater on or around February 21, 2000. After twenty days had passed, Bridgewater subsequently filed a motion for an order stating that the time to decide the new trial motion had lapsed pursuant to SDCL 15-6-59(b). The trial court issued an order, which "determined that the time for a new trial has lapsed statutorily." Heim appeals and raises one issue.

> Did the trial court err when it failed to order a new trial based on Heim's post-trial discovery of a livestock delivery record?

## ANALYSIS

*1. Standard of Review*

[¶9.] The procedure for granting or denying a motion for a new trial is set forth in SDCL 15-6-59(b) as follows:

> The court shall make and file the order granting or denying such new trial within twenty days after the service and filing of such motion, unless for good cause shown, the court files an order

---

1. The Animal Industry Board's website contains the following information regarding its purpose:

   > The Animal Industry Board is specifically charged with protecting the health of the animal industry of South Dakota under SDCL 40-3. Every aspect of our activities in regulatory operations takes into account this responsibility. Certain diseases have control and eradication programs such as brucellosis, pseudorabies, pullorum, etc. Other diseases are monitored for threats to the various industries. Requirements for inspections, identification, facilities, licensing, testing programs, and others constantly weigh the risk a threat may present versus the benefits of regulations to the industries and the people of South Dakota.

   Sam D. Holland, DVM, South Dakota Animal Industry Board, http://www.state.sd.us/aib/meatinspection.htm.

> within said twenty days extending the time for entering such order. ***If a motion for new trial has not been determined by the court and no order has been entered by the court extending the time for such ruling within twenty days from the date of service and filing of such motion, it shall be deemed denied.***[2]

SDCL 15-6-59 (emphasis added).

[¶10.]     We review specific grants or denials of a motion for a new trial under the abuse of discretion standard. Schmidt v. Royer, 1998 SD 5, ¶9, 574 NW2d 618, 621. As a matter of first impression, we must decide whether to apply the abuse of discretion standard when reviewing the statutory denial of a motion for a new trial because of the trial court's failure to rule upon the motion pursuant to SDCL 15-6-59(b). The statute states that when the trial court fails to pass upon a motion for a new trial within twenty days, such motion, "shall be deemed denied." SDCL 15-6-59(b). Thus, according to the plain meaning of the statute, the trial court is presumed to have exercised its discretion by letting the time-lapse serve as a denial of the motion just as if the trial court had affirmatively granted the motion. *See In re* Shepard's Estate, 34 CalRptr 212, 214 (CalApp 1963) (stating that the merits of a motion for a new trial denied by operation of law may be reviewed upon appeal in the same manner as if expressly denied by the court); Strauch v. Bieloh, 60 P2d 582, 584 (CalApp 1936) (stating that the abuse of discretion standard applies with equal force when the motion for a new trial is automatically denied for failure to pass upon the motion). Therefore, the abuse of discretion standard applies when the

---

2.     SDCL 15-6-59(b) has no federal counterpart.

motion for a new trial is automatically denied under the provisions of SDCL 15-6-59(b).

### 2. *Bridgewater's Jurisdictional Arguments*

[¶11.]     Bridgewater argues that Heim cannot appeal the statutory denial of his motion for a new trial because the trial court did not affirmatively rule on the merits.  Therefore, Bridgewater contends that this Court cannot address the issue for the first time on appeal.  Bridgewater cites no supporting authority for this argument and we find its rationale unpersuasive.  If we accepted Bridgewater's rationale, every statutory denial of a motion for a new trial pursuant to SDCL 15-6-59(b) would evade appellate review.  Furthermore, SDCL 15-26A-6, which governs the time limits for filing an appeal with this Court, contemplates the situation where the trial court fails to take action on a motion.  The relevant portion of the statute provides:

> The running of the time for filing a notice of appeal is terminated as to all parties by a timely motion filed in the circuit court by any party pursuant to §15-6-59 or § 15-6-50(b), or both, and the full time for appeal fixed by this section commences to run and is to be computed from the attestation and filing of an order made pursuant to such motion ***or if the circuit court fails to take action on such motion or fails to enter an order extending the time for taking action on such motion within the time prescribed,*** then the date shall be computed from the date on which the time for action by the circuit court expires.

SDCL 15-26A-6 (emphasis added).  If SDCL 15-6-59(b) were interpreted as Bridgewater suggests, the language in SDCL 15-26A-6 referencing the trial court's failure to take action on a motion would be rendered meaningless.  "[O]ur method of statutory interpretation requires that we find a meaningful understanding of a

statute where possible." Bon Homme Co. Comm'n v. AFSCME, 2005 SD 76, ¶22, 699 NW2d 441, 452. Accordingly, the trial court's failure to take action on Heim's motion for a new trial did not affect the availability of appellate review.

[¶12.] On the other hand, Bridgewater argues that this Court may not review Heim's motion for a new trial because SDCL 15-26A-9 provides that this Court may only review post-judgment motion rulings if they were "timely presented to the [trial] court."[3] Bridgewater contends that because Heim's motion was statutorily denied on timeliness grounds, a review of the motion would violate SDCL 15-26A-9. Bridgewater fails to appreciate the fact that Heim's motion for a new trial was timely presented to the trial court. It was the trial court itself that failed to take action within the statutorily prescribed time limit. Accordingly, Bridgewater's argument is without merit.

### 3. Newly Discovered Evidence

[¶13.] Heim argues that the trial court's statutory denial of a new trial was an abuse of discretion. Heim argues that the record from the Animal Industry Board is newly discovered evidence that Heim delivered buffalo to Bridgewater on February 21, 2000, a material disputed fact. We review the statutory denial of a motion for a new trial under the abuse of discretion standard. *See supra* ¶10.

[¶14.] When a party seeks a new trial under SDCL 15-6-59(a) based on newly discovered evidence, the party must "demonstrate first that it is newly discovered evidence and secondly that it could not, by reasonable diligence, have been

---

3. The full text of SDCL 15-26A-9 provides: "When reviewing an order denying a new trial, the Supreme Court may review all matters properly and timely presented to the court by the application for a new trial."

#24060

determined and produced at the trial and that it would be believed by the jury and would produce a different result. *City of Sioux Falls v. Missouri Basin Mun. Power Agency*, 2004 SD 14, ¶16, 675 NW2d 739, 744.

[¶15.] At trial, Heim presented a handwritten note that he had prepared dated February 21, 2000, which listed the buffalo he had delivered to Bridgewater on that date. The note included information such as the animal tag number, the animal carcass weight, and whether the buffalo was kosher.[4] Conversely, Parente testified that after thoroughly checking his records, he had no evidence that Heim made a delivery on that date. Parente further testified that he had contacted the U.S. Department of Agriculture (USDA) and was told that there was no record of such delivery. Heim claims that the first time he became aware that the USDA or any other agency kept records of animal deliveries to Bridgewater was when Parente testified at trial.

[¶16.] Only after the completion of the jury trial did Heim contact the USDA, which contacted the Animal Industry Board. According to the Animal Industry

---

4. Heim testified that he had prepared the handwritten note that was admitted into evidence. However, it is unclear how Heim obtained the information contained within the note. At trial, Heim claimed to have received the information from Bridgewater either through a phone call or a kill sheet he received, which he claimed was illegible. The illegible kill sheet was never admitted into evidence. Heim testified as follows:

Q. So you prepared [the handwritten note]?
A. I got the information from Bridgewater. Yes, I prepared this. I must not have been able to read the one that was sent to me.
Q. Did you have the one that was sent to you?
A. No. Sometimes I called down and got the information. That's how I found out which ones koshered and which ones didn't. I have no way of knowing that on my own.

Board's record, it tested sixteen buffalo on February 25, 2000, which had been delivered by Heim to Bridgewater. The tag numbers of these animals matched the tag numbers Heim had recorded in his handwritten note as having been delivered to Bridgewater on February 21. Heim argues that the Animal Industry Board's record is newly discovered evidence and that the trial court abused its discretion in not granting his motion for a new trial.

[¶17.] "The burden rests on the moving party to show there was no lack of diligence precluding earlier discovery. A new trial applicant will be denied relief, if the same effort to find the evidence expended after trial, would have produced it before trial." State v. Gehm, 1999 SD 82, ¶15, 600 NW2d 535, 540-41 (citing United States v. Bransen, 142 F2d 232, 235 (9thCir 1944)); *see also* George v. Estate of Baker, 724 NW2d 1, 12 n8 (Minn 2006) (stating that "[a] motion for a new trial upon the ground of newly discovered evidence is properly denied for lack of diligence of the moving party where the same diligence which led to the discovery of the new evidence after trial would have discovered it had such diligence been exercised prior thereto.").

[¶18.] In April of 2001, the parties began discussing Heim's allegation that he delivered buffalo in February 2000. Bridgewater instituted this lawsuit in July of 2003. Heim discovered the records from the Animal Industry Board between the December 2005 trial and the January 16, 2006 Motion. The records from the Animal Industry Board could have easily been obtained during the time period between 2001 and 2005. Besides Heim's lack of knowledge that these records existed at the time of trial, Heim offers no explanation as to why these records could

not have been discovered earlier. Knowing that he needed to prove that he had delivered buffalo to Bridgewater in February of 2000, it is reasonable to conclude that Heim could have checked sources such as the USDA and the Animal Industry Board, two agencies that are required by law to monitor, test, and regulate the meat processing industry.

[¶19.] Notwithstanding the lack of diligence, Heim fails to show that the newly discovered evidence would have been believed by the jury and would have produced a different result. *City of Sioux Falls*, 2004 SD 14, ¶16, 675 NW2d at 744. Even if the record from the Animal Industry Board were considered, it is still unclear if the buffalo were delivered pursuant to the Heim-Sparling or the Sparling-Parente Agreement. There was conflicting testimony as to whether the first load of buffalo delivered under the Sparling-Parente Agreement occurred in February or March of 2000. Whether the introduction of the record from the Agricultural Board would have changed the verdict is difficult to ascertain. The test is whether "there is a reasonable probability that the newly discovered evidence would probably produce a different result at a new trial." State v. Steele, 510 NW2d 661, 664 (SD 1994) (quoting State v. Willis, 396 NW2d 152, 154 (SD 1986)); *see also Gehm*, 1999 SD 82, ¶18, 600 NW2d at 542 (stating that "it is not enough to ask if the verdict would *possibly* be different. The question is would it *probably* be different."). While the record from the Animal Industry Board may have indicated that Heim delivered buffalo to Bridgewater in February of 2000, it did not answer the ultimate question as to whether Bridgewater was obligated to pay Heim for the delivery. Only under the Sparling-Parente Agreement could Bridgewater have been liable for

payment to Heim and the record of the Animal Industry Board is silent on that issue. Although the newly discovered Animal Industry Board record may lend support to Heim's claim, we can not conclude that the jury would have reached a different verdict had this evidence been presented.

[¶20.]    "New trial motions based on newly discovered evidence request extraordinary relief; they should be granted only in exceptional circumstances and then only if the requirements are strictly met." *Gehm*, 1999 SD 82, ¶15, 600 NW2d 535, 540. Considering the three to four year period in which Heim could have discovered the record from the Animal Industry Board, the lack of showing that the verdict probably would have been different, and our deferential standard of review, the statutory denial of Heim's motion for a new trial was not an abuse of discretion.

[¶21.]    Affirmed.

[¶22.]    GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.