#24835-a-SLZ

**2009 SD 55**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JAMES KLUTMAN, ROSE KLUTMAN
and GAYLEN KLUTMAN,

Plaintiffs and Appellees,

v.

SIOUX FALLS STORM, a/k/a K.T., LLC,
SIOUX FALLS ARENA, managed by SMG,

Defendants and Appellants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA  COUNTY, SOUTH DAKOTA

* * * *

HONORABLE KATHLEEN K. CALDWELL
Judge

* * * *

MICHAEL W. STRAIN of
Morman Law Firm
Sturgis, South Dakota
and
JACK DER HAGOPIAN of
DerHagopian Law Office
Sioux Falls, South Dakota

Attorneys for plaintiffs
and appellees.

JOEL D. VOSS
JAMES W. REDMOND of
Heidman Law Firm, LLP
Sioux City, Iowa

Attorneys for defendants
and appellants.

* * * *

ARGUED MARCH 25, 2009

OPINION FILED **07/08/09**

#24835

ZINTER, Justice

[¶1.]        Gaylen Klutman suffered a knee injury during a promotional event for the Sioux Falls Storm, an indoor football team. He alleged that his injury was caused by negligently installed, inspected and maintained synthetic turf. A jury awarded $500,000 in damages and the Storm appeals. We affirm.

*Facts and Procedural History*

[¶2.]        On February 25, 2002, the Storm hosted a promotional season kick-off event. The event included an autograph session, youth clinic and a celebrity football game. Gaylen, age 17, attended with his father and younger brother. At some point, children were called to the field and Gaylen's brother went onto the field. Gaylen asked his father if he could participate, and because it appeared there were other children around Gaylen's age, his father gave him permission. The participants did not sign waivers and no warnings were provided concerning the condition of the field.

[¶3.]        The field was covered with synthetic turf that was installed in five-yard increments from rolls weighing approximately five-hundred pounds. The pieces were butted together and secured by a Velcro fastening system. It was not uncommon for there to be gaps between the pieces requiring adjustment. At the time of the incident, there was no established protocol for ensuring the adequacy of the turf installation; although team officials indicated they noticed nothing out of the ordinary with the turf that day.

[¶4.]        After being called onto the field, the children were divided into teams and began playing an informal game of touch football. The children were not

-1-

supervised. According to Gaylen, after only a few plays in the game, he received a short pass and began to run straight ahead when he came to a sudden halt and fell backwards. There were no other players in the vicinity, and he did not fall as the result of contact with another player. He testified he blacked out and when he regained awareness he was lying on his back with his foot caught under the turf. Gaylen's younger brother was the first person to come to his aid, and they both testified that Gaylen's foot was caught under the turf. His younger brother was not able to remove Gaylen's foot, and it was unclear who actually removed his foot from under the turf. Gaylen received immediate medical assistance, his knee was iced, and he was taken to the hospital by his father.

[¶5.] Gaylen's knee was severely damaged, and he eventually underwent evaluation and surgery at the Mayo Clinic. He was diagnosed with a "complete disruption of the anterior cruciate ligament, lateral or fibular collateral ligament and posterolateral structures, with a partial tear of the posterior cruciate ligament and a complete pereneal nerve palsy." The damage to the pereneal nerve resulted in a "foot drop," and Gaylen was unable to lift his foot on his own. He continued to wear a brace for the foot drop, an injury that was considered permanent with muscle function not expected to return. Although Gaylen attempted a number of different activities and jobs, he alleged that he had been largely unsuccessful as the result of his injury.

[¶6.] The Storm did not dispute the injury or that it occurred on the football field that day. Rather, it maintained that the injury was not caused by any negligence relating to the installation, maintenance or condition of the turf. It

argued that the injury was incurred during the course of normal football play. Officials from the Storm testified that gaps in the field were expected, but they noticed nothing unusual about the turf during the event. A turf expert testified that small gaps in the turf were normal, and that if installed properly, the injury Gaylen described would not have occurred. Essentially, the Storm disputed Gaylen's assertion that he caught his foot on the turf.

[¶7.]     In support of its position, the Storm called Collin Steen, the team president. Steen testified that from 2001 until the time of trial, he had never heard of an injury where someone claimed to have pushed their foot under the turf. He did, however, concede on cross-examination that the Storm had since taped the seams in the turf beginning in the 2003 season. The evidence of subsequent taping was elicited by Gaylen after the court found that the Storm had opened the door to the admission of subsequent remedial measures. Concerning that taping, the following exchange took place:

> Counsel: The line markers that are Velcroed, the tape goes over the seam, does it not?
> Steen: That's correct.
> Counsel: It covers the seam?
> Steen: Correct.
> Counsel: So when the Velcro pulls apart – you have testified that the Velcro pulls apart sometimes.
> Steen: Yes, it does.
> Counsel: That would cover that; is that correct?
> Steen: That's correct.
> Counsel: If it were lifted up or up a little bit, the tape would hold it down, would it not?
> Steen: Yes, it would.

Although Steen only testified about post-incident taping, a trainer for the team acknowledged that tape had also been used on the seams prior to the date of the

injury: the only difference being the tape apparently changed colors from green to white.

[¶8.] This taping was described by the Storm as being as much about aesthetics, if not more, than about safety. On the other hand, evidence was introduced that in an attempt to obtain new turf, Steen appeared before the city council and indicated the team was seeking new turf in part because the old turf presented a danger to the players. At the time of trial, this same turf was still being used by the Storm.

[¶9.] Following the jury's general verdict in favor of Gaylen, the Storm moved for a new trial asserting a number of trial errors and newly discovered evidence relating to the extent of Gaylen's disability. The trial court did not expressly rule on the motion: it was denied by operation of law pursuant to SDCL 15-6-59(b). The Storm appeals raising six issues.

*Decision*

[¶10.] 1. *Whether the trial court abused its discretion in granting a motion to amend the complaint to add Gaylen's parents as additional plaintiffs.*

[¶11.] An analysis of this question is complicated by the fact that the Storm did not make a clear record facilitating appellate review. The record that does exist reflects that Gaylen was seventeen years of age at the time of the injury, and the original complaint, filed on February 24, 2004, named only Gaylen as the plaintiff. On December 5, 2005, an amended complaint was filed based on a stipulation of the parties and again named Gaylen as the only plaintiff. Both complaints, however, alleged damages that put the Storm on notice the suit sought all past, present and

future medical expenses incurred from the time of injury, which would have included those incurred during Gaylen's minority. Both complaints alleged:

> Plaintiff, Gaylen Klutman has suffered serious and permanent personal injuries (as a result of the Defendants' actions) and other serious injuries all of which caused him to experience great pain and suffering (past, present and future), to suffer mental anguish, to sustain a loss of earning capacity, to sustain a loss of wages and further causing this plaintiff embarrassment, inconvenience and emotional distress, loss of enjoyment of life, to incur expenses for medical care and treatment (past, present and future) all to his general and special damage.

[¶12.] Furthermore, although the Storm now alleges trial error in allowing amendment of the complaint, the first record of an objection does not appear until after the amendment. That record was made during the settlement of jury instructions when counsel for the Storm stated "[w]e also object to the jury instructions insofar as they deal with the medical bills which were incurred by Gaylen prior to his turning age 18, since that is a claim that belongs to the parents. We made a record about that earlier."[1] In subsequently denying an apparently related motion for directed verdict, the court stated: "As to the claim by a minor, the plaintiffs at the beginning of the case amended their complaint to include the parents, and I allowed that, so that will be my ruling."[2] Thus, from what we can tell from the record, it appears that the amendment was granted before trial

---

1. The Storm has not provided this Court with any such record and counsel conceded during oral argument that a discussion on this issue does not appear in the record until this point.

2. That ruling was never reduced to writing, and there is no discussion on the merits in the record.

following an oral objection by the Storm, an oral motion to amend by Gaylen, and an oral ruling by the trial court. But again, there is no record of the arguments supporting and opposing the motion to amend or the court's reasoning for its decision.

[¶13.] Notwithstanding the Storm's failure to present a record facilitating review of this issue, the Storm argues that the addition of the parents to the complaint prejudiced their defense by allowing the parents to assert claims for medical expenses and gratuitous services rendered to Gaylen, which by the time of trial were barred under the statute of limitations. Gaylen responds that the amendment did not prejudice the Storm because it was on notice of the claimed damages from the first two complaints. Gaylen also argues that the amendment did not permit a barred claim because the amendment related back to the time of the filing of the original complaint. "The standard of review on a motion granting an amendment of a pleading is clear abuse of discretion resulting in prejudice to the non-moving party." Burhenn v. Dennis Supply Co., 2004 SD 91, ¶20, 685 NW2d 778, 783.

[¶14.] "A trial court may permit the amendment of pleadings before, during, and after trial without the adverse party's consent." Id. (quoting Dakota Cheese, Inc. v. Ford, 1999 SD 147, ¶24, 603 NW2d 73, 78). "SDCL 15-6-15(a) provides in relevant part that leave to amend shall be freely given when justice so requires." Prairie Lakes Health Care Sys., Inc. v. Wookey, 1998 SD 99, ¶28, 583 NW2d 405, 417.

[¶15.] The rule of relation back is governed by SDCL 15-6-15(c), which allows relation back when the claim asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth in the original complaint.

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted[3] relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment:
>
> (1) Has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and
>
> (2) Knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

SDCL 15-6-15(c). This Court has recognized that as a general proposition, "an amended pleading naming a new party in a lawsuit does not relate back under Rule 15(c)." Hedel-Ostrowski v. City of Spearfish, 2004 SD 55, ¶8, 679 NW2d 491, 495. "When facts in an amendment state a different cause of action from the original claim, the statute of limitations runs to the date of the amendment." Lewis v. Moorhead, 522 NW2d 1, 6 (SD 1994) (citation omitted). The Storm further points

---

3. By its terms, this second sentence of SDCL 15-6-15(c) applies to "[a]n amendment changing the party against whom a claim is asserted," which in the usual case is a defendant. "Though Rule 15(c) as it reads applies to amendment affecting defendants, it has been held that it is to be applied by analogy to amendments changing plaintiffs." Bd. of Water & Sewer Comm'rs of the City of Mobile v. McDonald, 322 So2d 717, 720 (AlaCivApp 1975) (citing 6 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1501).

out that "[w]hen a child is injured by another's negligence two causes of action arise; one in favor of the child for the injury as such, the other in favor of the parent generally for the loss of services during minority, and the expenses caused by the injury." Doyen v. Lamb, 75 SD 77, 82, 59 NW2d 550, 552 (1953) (citation omitted). Therefore, the Storm contends that by allowing the addition of Gaylen's parents as party plaintiffs, Gaylen's parents were allowed to bring a new cause of action for their medical expenses and gratuitous services in the care of their son, a cause of action that had not been pleaded prior to the expiration of the statute of limitations.

[¶16.]		This case is, however, remarkably similar to *City of Miami v. Cisneros*, 662 So2d 1272 (FlaDistCtApp 1995). In that case, an eleven-year-old boy was injured during a football game. On the morning of trial, the parents moved to amend the complaint to add themselves as parties for the purpose of claiming their son's medical expenses. The trial court granted the motion. On appeal, the court held that the trial court properly permitted the amendment when the sole purpose of the amendment was to claim medical expenses incurred and the defendant was aware of those expenses for a significant period of time. The court observed: "Under the 'relation-back' approach, for limitations considerations, the addition of a party is allowed if it can be said that the new and former parties have an identity of interest so as to not prejudice the opponent by the addition." *Id.* at 1274 (citing R.A. Jones & Sons, Inc. v. Holman, 470 So2d 60 (FlaDistCtApp 1985), *review dismissed,* 482 So2d 348 (Fla 1986); Williams v. United States, 405 F2d 234 (5thCir 1968)). *See also* Rockdale Health Sys., Inc. v. Holder, 640 SE2d 52, 54 (GaCtApp 2006) (concluding: "Inasmuch as there is a direct connection between the old and new

parties, the complaint, as amended, related back to the original complaint."); Ron's Quality Towing, Inc. v. Se. Bank of Fla., 765 So2d 134, 136 (FlaDistCtApp 2000) (concluding: "Addition of a new party plaintiff should be permitted if the new and former parties have an identity of interest so as not to prejudice the adverse party by the addition."); Roger Dean Chevrolet, Inc. v. Lashley, 580 So2d 171, 172 (FlaDistCtApp 1991) (concluding: "[A]n amendment adding a party plaintiff in a case which does not substantially change a cause of action may be made even after the statute of limitations has run.").

[¶17.]     Although the Storm maintains it was prejudiced by the late amendment, a review of the record reveals that the Storm could not claim surprise. It could not claim surprise because the first two complaints explicitly sought all past, present and future damages, including related medical expenses. It appears that the omission of the parents as a technical requirement for asserting the pre-eighteen medical expenses was an oversight. Concerning the gratuitous services, Gaylen's mother testified she assisted her son with physical therapy and cared for him following his injury. However, Gaylen did not quantify the value of those services in testimony or closing arguments, and the jury was not asked to award a specific dollar amount.[4] Further, there was no special verdict or prejudgment

---

4.    The Storm relies on deposition and interrogatory testimony in support of its claim that damages for gratuitous services rendered by family members was not timely disclosed. That claim is not, however, referenced to the record. Furthermore, that evidence was not made a part of the settled record. It appears for the first time in the appendix. The testimony includes the deposition of Rose Klutman, Gaylen's mother, which was mentioned in the briefs and during oral argument as demonstrating a lack of notice of the

(continued . . .)

interest calculation form reflecting that the jury included an award for gratuitous services. Given this record, the Storm has failed to establish any reasonable likelihood that an award was made for such services. Ultimately, given the lack of a record concerning the amendment, the identity of interests of Gaylen and his parents, and the failure to establish prejudice, the trial court did not abuse its discretion in allowing the amendment.

[¶18.]    **2.**    *Whether the trial court abused its discretion in limiting the expert testimony of Edward Milner.*

[¶19.]    The Storm sought to introduce expert testimony from Edward Milner, a chemical engineer, relating to the installation, inspection and safety of the synthetic turf. Additionally, in his report, Milner offered an opinion regarding the cause of Gaylen's anatomical injury. He opined "Klutman's injury is typical of a twisting action rather than a tripping one. The knee ligaments were damaged in the course of being twisted." Milner indicated that the basis of his opinion was Gaylen's comments after the injury and his medical records, which Milner alleged corroborated that the injuries were caused by a "twisting fall" rather than a defect in the turf.

[¶20.]    Gaylen filed a motion in limine to preclude Milner from opining on the causation of the injury. Gaylen conceded Milner was an expert on synthetic turf,

---

(. . . continued)

gratuitous services. SDCL 15-26A-47 requires that: "The original pleadings, papers, offered exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases." Because this evidence is not part of the record, the testimony is not considered by the Court.

but asserted that Milner had no training, education or experience to offer his opinion on the medical causation of the injury. In determining Milner's qualifications to offer causation testimony, the trial court observed that while Milner had extensive experience in the area of synthetic turf and sports safety, he did not have any formal medical training. Additionally, he had no training on the review of medical records allowing him to render opinions from those records concerning the causation of an injury. Nevertheless, the Storm maintained that because Milner worked alongside biomechanicists and others involved in sports injuries, and because he attended classes on biomechanics and sports injuries, he was qualified to render a causation opinion. The trial court disagreed, precluding Milner from testifying "as to medical causation of [Gaylen's] injuries." On appeal, the Storm argues that the trial court "set the bar too high." The Storm contends the court applied too rigid of a standard in assessing Milner's qualifications by discounting his practical knowledge and experience and by focusing on his lack of formal medical training. We disagree.

[¶21.]     The admission of expert testimony is governed by SDCL 19-15-2 (Rule 702). This statute provides, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." SDCL 19-15-2 (Rule 702). Under this rule, "[a] trial court is responsible for deciding whether an expert's knowledge will 'assist the trier of fact to understand the evidence or to determine a fact in issue." Burley v. Kytec Innovative Sports Equip., Inc., 2007 SD

82, ¶16, 737 NW2d 397, 404 (quoting SDCL 19-15-2). "[T]hat responsibility includes determining 'whether a particular expert has sufficient specialized knowledge[5] to assist jurors in deciding the specific issues in the case.'" *Id*. (quoting Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F3d 706, 715 (8thCir 2001)). We review a trial court's decision to admit or deny an expert's testimony under the abuse of discretion standard. *Id*. ¶12 (citation omitted).

[¶22.]     Although we agree that the qualification of an expert witness is not determined based solely on the attainment of specific titles or degrees, it is a factor. In this case, Milner was a chemical engineer and the parties conceded his credentials were impressive as they related to synthetic turf. However, these credentials were not related to medical causation. Therefore, to qualify Milner, the

---

5.     Although the parties have briefed and argued this issue as a *Daubert* reliability question, we view the matter as controlled by another inquiry under Rule 702: whether the witness was "qualified" to give an opinion on the subject at issue. *See* SDCL 19-15-2 (Rule 702); *Burley*, 2007 SD 82, ¶¶ 13-16, 737 NW2d at 402-04. This is one of three prerequisites to the admission of expert testimony.

> There are three basic prerequisites to the admissibility of evidence from expert witnesses. First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in understanding the evidence or in making factual determinations necessary to decide the ultimate issue of fact. Second, the proposed witness must be qualified to provide the finder of fact with that assistance. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

Weinstein's Federal Evidence, *Testimony by Experts*, § 702.02[3] (2nd ed 2008).

Storm was obligated to make a showing of expertise, acquired in some other manner, in rendering causation opinions based on the physical damage to the structures within the knee or upon a review of a doctor's medical records. The Storm failed to make that showing. The Storm made no showing that Milner had training in either interpreting medical records or basing an opinion on such records. And although he may have worked closely with those who dealt with sports injuries, the Storm's failure to establish Milner's expertise on medical causation was highlighted by the testimony of Dr. Michael J. Stuart, Gaylen's treating orthopedic surgeon specializing in knee and sports medicine at the Mayo Clinic. When Dr. Stuart was asked if he could tell from this injury how it happened, he responded:

> No; we can't tell exactly how it happened. We know that there w[ere] forces subjected to the knee which caused failure of multiple ligaments. So it's a very significant injury mechanism. But exactly how it happened, typically, there is a deceleration or slowing down component of it. Often there could be a tortional or twisting mechanism. There could also be a hyperextension or back-knee mechanism. With these types of injuries it's often a combination of all the above.

On this record, the trial court did not abuse its discretion in prohibiting Milner's proposed medical opinion regarding causation.[6]

[¶23.]     3.     *Whether the trial court abused its discretion in refusing a contributory negligence instruction.*

---

6.     Both parties rely on Milner's deposition testimony in support of their positions. Although they have included the testimony in their appendices, the deposition is not a part of the settled record and we do not consider it.

[¶24.]    "Contributory negligence is negligence on the part of a plaintiff which, when combined with the negligence of a defendant, contributes as a legal cause in the bringing about of the injury to the plaintiff." Steffen v. Schwan's Sales Enters., Inc., 2006 SD 41, ¶12, 713 NW2d 614, 619 (quoting S.D. Pattern Jury Instruction 11-01). There must be competent evidence of contributory negligence before the matter may be submitted to the jury. *Id.* ¶10. "The trial court is not required to instruct on issues lacking support in the record." Buxcel v. First Fid. Bank, 1999 SD 126, ¶13, 601 NW2d 593, 596 (citation omitted). "We review a trial court's refusal of a proposed instruction under an abuse of discretion standard." Luke v. Deal, 2005 SD 6, ¶11, 692 NW2d 165, 168.

[¶25.]    Although the trial court allowed an instruction on assumption of the risk, it denied the Storm's proposed instruction concerning contributory negligence. The Storm objected to the failure to give that instruction stating:

> And we also object to the failure to give a contributory negligence instruction due in part because as a typical fall of this nature take[s] place at any type of premises, whenever a safe premises claim is made, the issue becomes: Was the plaintiff keeping a proper lookout? It should be a fact issue for the jury to determine whether the plaintiff was keeping a proper lookout, particularly if you try to accept his version of the facts that he had caught a pass and was running straight down the field. If it was some type of a flap or fold or something in front of him on the field, for a distance of I think he said five or even ten yards, he should have seen something and stepped past it. That's the essence of our objections.

On appeal, the Storm contends that a contributory negligence instruction was required under the "open and obvious danger rule."[7]

[¶26.]    The record, however, reflects that the Storm offered no evidence of an open and obvious danger that Gaylen should have avoided.  On the contrary, the Storm's trial theory was that there were no openings or gaps in the seams that could have caused Gaylen's injury.  Further, there was no evidence that warnings were given concerning the condition of the field.  Therefore, there was no evidentiary basis that Gaylen had, or reasonably should have had, an appreciation for any open or obvious danger regarding the turf or that he was otherwise contributorily negligent with respect to his injury.  *See* Johnson v. Armfield, 2003 SD 134, ¶¶11-15, 672 NW2d 478, 481-82 (holding that the trial court erred in allowing a contributory negligence instruction based on a "bare assertion" of alleged negligence).  We conclude that the trial court did not abuse its discretion in declining to give a contributory negligence instruction.

[¶27.]    4.    *Whether the trial court abused its discretion in allowing impeachment that included evidence of a subsequent remedial measure.*

[¶28.]    Prior to trial, the court granted a motion in limine precluding mention of subsequent remedial measures taken with regard to the turf.  However, Collin

---

7.    Concerning an open or obvious danger, the jury was instructed that:
     In general, an owner or possessor of land is not liable to an invitee for physical harm caused to them by an activity or condition on the land whose danger is known or obvious to the invitee.  However, if the owner or possessor of land has reason to believe that the condition will harm the invitee despite its obviousness, the owner

(continued . . .)

Steen, the Storm president, testified on direct examination that the turf had been used from 2001 until trial without anyone claiming to have been injured by catching their foot under the turf. Based on this testimony, the court allowed Gaylen to impeach Steen with the fact that after Gaylen's injury, the Storm taped the seams of the turf. The Storm contends that this evidence of seam taping was a subsequent remedial measure not subject to admission by impeachment. "We review a trial court's evidentiary rulings under an abuse of discretion standard." Behrens v. Wedmore, 2005 SD 79, ¶63, 698 NW2d 555, 579.

[¶29.]     "[T]he general rule is that subsequent remedial measures are not admissible as evidence." First Premier Bank v. Kolcraft Enters., Inc., 2004 SD 92, ¶46, 686 NW2d 430, 450 (overruled on other grounds). The rule is founded on SDCL 19-12-9 (Rule 407), which provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This section does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

[¶30.]     Although the Storm contends the trial court erred in admitting this evidence under the impeachment exception, we conclude the evidence was admissible because it did not involve a subsequent remedial measure. By its

_____

(. . . continued)
          or possessor has a duty to warn the invitee regarding the condition
          or to take other reasonable steps to protect the invitee.

language, SDCL 19-12-9 (Rule 407) only applies to remedial actions taken "after an event;" hence the denomination as *subsequent* remedial measures. The rule "was designed to ensure that the threat of legal liability would not discourage remedial measures to improve products." *First Premier Bank*, 2004 SD 92, ¶50, 686 NW2d at 451. Consequently, predetermined measures do not qualify as inadmissible subsequent remedial measures under the rule:

> The word "remedial" means "*intended* for a remedy or for the removal or abatement of a disease or of an evil." Webster's Third Int'l Dictionary 1920 (1993) (emphasis added). Thus, a "measure" is "remedial" if it is intended to address the occurrence of an event by making the event less likely to happen in the future. Therefore, measures that are taken after an event but that are predetermined before the event are not "remedial" under [the rule], because *they are not intended to address the event*.

Ranches v. City and County of Honolulu, 168 P3d 592, 597-98 (Haw 2007).

[¶31.]    In this case, the cross-examination of Steen revealed that taping occurred after the date of the injury. Norm Stone, however, a trainer with the Storm, testified that although taping color changed from green to white after the incident, taping of the seams was a practice that preceded the date of Gaylen's injury.[8] Because the record presented to this Court indicates that taping occurred

---

8.    Although Stone may have been unsure of the color of tape, he testified that the seams were taped prior to Gaylen's injury:

> Counsel: You actually saw them back in 2000, 2001, 2002, put green tape over the seams; true?
> Stone:   I couldn't testify to the exact color of the tape.
> Counsel: Do you remember your deposition being given in this matter?
> Stone:   I think I did say green in the depo.

(continued . . .)

both prior to and after Gaylen's injury, Steen's cross-examination did not concern

the type of subsequent remedial measure prohibited by SDCL 19-12-9 (Rule 407).

We therefore affirm the trial court without considering the impeachment exception.

[¶32.]     5.     *Whether the trial court abused its discretion in denying*
                  *a motion for new trial based on newly discovered evidence.*

[¶33.]     The Storm filed a motion for new trial raising several issues that it

asserted compromised the verdict.  On appeal, the Storm pursues the newly

discovered evidence issue, asserting that Gaylen concealed evidence of his physical

abilities, evidence that was inconsistent with what he claimed at trial.  The Storm's

appeal is based on its post-trial motion asserting that:

> After the trial in this matter had been completed, [the Storm]
> received information from the coach of the Sioux Falls
> Lawdawgs, a semi-professional football team in South Dakota.
> [Gaylen] had tried out, practiced and played with the Lawdawgs
> in October and November 2007.  This information was concealed
> and never provided to the [Storm] through the discovery process
> despite [Gaylen's] duty to supplement interrogatories.

These  assertions were supported by an: "Attached Affidavit and corresponding

Exhibits incorporated hereto as Exhibits 16, 16A, 16B, 16C, 16D and 16E."  The

"Affidavit in Support of Defendant's Motion for New Trial" was made by the Storm's

--------

(. . . continued)

Counsel:  You did say green tape you saw them put over it.  And
          that would have been in 2001—2000, 2001 when the
          carpet first came to the Arena, being used by the
          Cobras?
Stone:    True.
Counsel:  And subsequent by the Storm?
Stone:    True.

attorney. Counsel's affidavit addressed the newly discovered evidence of Gaylen's post-injury conduct, also referring to the previously mentioned exhibits. Counsel stated:

43. Following trial in this matter, Steen [the Storm president] was contacted by the coach of the Sioux Falls Lawdawgs, Jordan Taylor.

44. The Sioux Falls Lawdawgs is a semi-professional football team in South Dakota. See Exhibit 16, Affidavit of Jordan Taylor, Exhibit 16C, Website Information.

45. Jordan Taylor represented to both Colin Steen and the affiant that the Plaintiff, Gaylen Klutman, signed and submitted an application to play football with the Lawdawgs on October 17, 2007. See Exhibit 16, Affidavit of Jordan Taylor; Exhibit 16A, Application; Exhibit 16B, Program Roster. He also believed Gaylen Klutman had applied to the team and played in years prior to 2007.

46. Jordan Taylor informed Steen that [Gaylen] practiced with the Lawdawgs throughout October of 2007, three times a week for a three-hour practice, without limitation or restriction. See Exhibit 16, Affidavit of Jordan Taylor.

47. Jordan Taylor further indicated [Gaylen] went with the Lawdawgs to a game on November 10, 2007. See Exhibit 16, Affidavit of Jordan Taylor; Exhibit 16B, Program Roster; Exhibits 16D-16E, Photographs of Gaylen Klutman, Jersey Number 46, taken on 11-10-07.

[¶34.] Our problem in reviewing this issue is that although the motion and attorney's affidavit appear in the record, none of the supporting evidentiary exhibits referenced in the two documents are included.[9] In the absence of the supporting exhibits, the affidavit of counsel does not stand on its own merit. *See* Andrushchenko v. Silchuk, 2008 SD 8, ¶11, 744 NW2d 850, 855 (discussing the

---

9. The Storm also cites Gaylen's deposition testimony which is not in the record.

propriety of attorney affidavits only for uncontested facts or matters of mere formality). This leaves us with little to review other than the Storm's argument.

[¶35.] In responding to the Storm's argument, Gaylen also relies on documents not in the record. Gaylen's brief references an affidavit of Marc Phillips, a former Lawdawgs player, and Sharla Reynolds, Gaylen's fiancée, relaying Gaylen's alleged diminished level of participation with the Lawdawgs.[10] It is unknown whether the trial court considered either parties' extra record evidence because the time to rule on the motion for new trial expired and the motion was deemed denied by operation of law. *See* SDCL 15-6-59(b).

[¶36.] It is well settled that this Court's review is "restricted to facts contained within the settled record." Toben v. Jeske, 2006 SD 57, ¶11, 718 NW2d 32, 35. It is immaterial if the settled record contains references to or an acknowledgment of items omitted from the settled record. *See id.* (holding an affidavit referred to by the court and the parties but not contained in the record could not be considered on appeal). "Moreover, all parties are obligated to see that the settled record contains all matters necessary for the disposition of the issues raised on appeal, and the ultimate responsibility for presenting an adequate record on appeal falls upon the appellant." *Id.* (quoting Caneva v. Miners & Merchants Bank, 335 NW2d 339, 342 (SD 1983)). *See also* Huelsman v. Civic Center Corp.,

---

10. On appeal, the Storm moved to strike these affidavits because they were not in the record. We deferred consideration of the motion until consideration of the merits. In light of our disposition on the merits, we need not decide the motion to strike.

873 F2d 1171, 1175 (8thCir 1989) (concluding: "An appellate court can properly consider only the record and facts before the district court and thus only those papers and exhibits filed in the district court can constitute the record on appeal. Because this affidavit is presented for the first time at the appellate stage, it is not part of the record for our review."). Thus, "[t]he [appellant's] argument suffers from the fatal flaw of being premised upon facts that are not contained within the settled record. This Court has repeatedly instructed that the party claiming error carries the responsibility of ensuring an adequate record for review." Okerson v. Common Council of the City of Hot Springs, 2009 SD 30, ¶8, __NW2d __ (citation omitted).

[¶37.] Through recent rule changes this Court has encouraged parties to include an appendix containing the documents necessary to resolve appeals.[11] Nevertheless, an appendix is not a substitute for designating and submitting the record on appeal. Documents in the appendix must be included within, and should be cross-referenced to, the settled record. *See* SDCL 15-26A-60(8) (providing that "[t]he appendix shall include . . . any relevant portions of the pleadings, instructions, and transcripts" and "any other parts *of the record* to which the parties wish to direct the particular attention of the Court.") (emphasis added). Neither party has followed these rules in making their appellate arguments on this issue.

[¶38.] "When a party seeks a new trial under SDCL 15-6-59(a) based on newly discovered evidence, the party must demonstrate first that it is newly

---

11. 2007 SD Sess Laws ch. 309 (Supreme Court Rule 06-77); 2004 SD Sess Laws ch. 315 (Supreme Court Rule 03-14).

discovered evidence and second[] that it could not, by reasonable diligence, have been determined and produced at the trial and that it would be believed by the jury and would produce a different result." Bridgewater Quality Meats, LLC v. Heim, 2007 SD 23, ¶14, 729 NW2d 387, 393 (citation omitted). Moreover, "[n]ew trial motions based on newly discovered evidence request extraordinary relief; they should be granted only in exceptional circumstances and then only if the requirements are strictly met." Id. ¶20 (quoting State v. Gehm, 1999 SD 82, ¶15, 600 NW2d 535, 540). Without record evidence, the Storm did not meet these requirements. We affirm the trial court's denial of the motion for new trial.

[¶39.]     6.     *Whether the jury verdict was supported by sufficient evidence.*

[¶40.]     In its motion for new trial, the Storm argued that "[t]here was insufficient evidence in the case to quantify a verdict in that there was no evidence that [the Storm] failed to properly install or inspect the artificial turf." In determining if there was sufficient evidence to support the jury's decision, "we review the testimony and evidence in a light most favorable to the verdict or to the nonmoving party." Christenson v. Bergeson, 2004 SD 113, ¶12, 688 NW2d 421, 425-26 (citation omitted). "[W]ithout weighing the evidence, [this Court] must decide if there is evidence which would have supported or did support a verdict." Id. We are also mindful that questions of negligence "are almost always questions for the jury." Thompson v. Mehlhaff, 2005 SD 69, ¶40, 698 NW2d 512, 524 (citation omitted).

#24835

[¶41.] The Storm contends that there was no evidence to support a finding of negligence and Gaylen's claims were refuted at each turn. However, a review of the record in a light most favorable to the verdict reflects that no warnings were given to the participants concerning the condition of the turf; the children were playing unsupervised; the turf had a tendency to create gaps or folds or needed to be readjusted; there was no established protocol to ensure the safety of the turf; the Storm sought new turf because they characterized the field as dangerous to the players; the Storm had taped the seams on the turf, but it was not done during the promotional event; Gaylen and his brother both testified that Gaylen's foot was caught under the turf that day; and, Gaylen suffered a serious physical injury and damages. Under our deferential standard of review, there existed ample evidence to support the verdict.

[¶42.] Affirmed.

[¶43.] GILBERTSON, Chief Justice, and KONENKAMP and MEIERHENRY, Justices, and SABERS, Retired Justice, concur.